Barry I. Levy
Michael A. Sirignano
Michael Vanunu
Philip P. Nash
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and        Docket No.:_____ (    )
GEICO CASUALTY COMPANY,

                             Plaintiffs,

                                         **Plaintiff Demands a Trial by Jury**

          -against-

MEDIGNA INC., MILASIG INC., LEVMIC INC.,
MEDNAVET INC., NALATOR INC., JUNATO INC.,
NAYUVITO INC., TIARILLIE INC., VIGULL INC.,
MATTANA INC., LARYSSA MEDVID, LUDMILA
SIGAL, VERA SHERAPOVA, ALEXANDER
BERCHANSKY, and JOHN DOE DEFENDANTS 1-
10,

                           Defendants.
-------------------------------------------------------------------X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.     GEICO brings this action to recover more than $1.1 million that the Defendants have wrongfully obtained from GEICO by submitting and causing thousands of fraudulent no-fault insurance charges to be submitted relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic car seats, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through a series of companies known as Medigna Inc. ("Medigna"), Milasig, Inc. ("Milasig"), Levmic Inc. ("Levmic"), Mednavet Inc. ("Mednavet"), Nalator Inc. ("Nalator"), Junato Inc. ("Junato"), Nayuvito Inc. ("Nayuvito"), Tiarillie Inc. ("Tiarillie"), Vigull Inc. ("Vigull"), and Mattana Inc. ("Mattana") (collectively, the "DME Providers"). The DME Providers are all New York corporations that at various points in time have dispensed DME to persons who were allegedly involved and injured in automobile accidents and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds"). This vast array of companies are purportedly owned by Laryssa Medvid ("L. Medvid"), Ludmila Sigal ("L. Sigal"), Vera Sherapova ("V. Sherapova"), and Alexander Berchansky ("A. Berchansky") (collectively, the "Paper Owner Defendants"), who in conjunction with others not presently identifiable to GEICO, devised a scheme to obtain medically unnecessary and often photocopied prescriptions from healthcare providers working out of no-fault clinics in the New York metropolitan area (the "Referring Providers") through unlawful kickbacks and other financial incentives. Once the prescriptions were secured, the Defendants then billed GEICO collectively more than $3.8 million, with each DME Provider making common fraudulent misrepresentations to GEICO concerning the types of Fraudulent Equipment purportedly provided to Insureds and the maximum reimbursement rates they were entitled to receive. As part of their scheme to extract money from GEICO, the

Defendants shifted the billing submitted to GEICO from one DME Provider to the next over the course of several years and continue to do so through today.

2.     GEICO seeks to terminate this fraudulent scheme and recover more than $1.1 million that has been wrongfully obtained by the DME Providers, the Paper Owner Defendants, and John Doe Defendants "1" – "10" (the "John Doe Defendants") (collectively, the "Defendants") since 2018 and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1.7 million in pending no-fault insurance claims that have been submitted by or on behalf of the DME Providers since 2018 because:

(i)     The Defendants billed GEICO for Fraudulent Equipment when they were ineligible to collect No-Fault Benefits because they failed to comply with local licensing requirements;

(ii)    The Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements with others who are not presently identifiable;

(iii)   The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent provided – pursuant to prescriptions purportedly issued by the Referring Providers as a result of predetermined fraudulent protocols, which were solely to financially enrich the Defendants and others not presently known rather than to treat the Insureds;

(iv)    The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(v)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(vi)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

3.      The Defendants fall into the following categories:

(i)      The DME Providers are New York corporations that purport to purchase DME and OD from wholesalers, purport to provide Fraudulent Equipment to automobile accident victims, and bill New York automobile insurance companies, including GEICO, for Fraudulent Equipment;

(ii)     Defendant L. Medvid is listed on paper as the owner, operator, and controller of Medigna, Mednavet, Nayuvito and Mattana when, as discussed below, L. Medvid works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used Medigna, Mednavet, Nayuvito and Mattana to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii)    Defendant L. Sigal is listed on paper as the owner, operator, and controller of Milasig and Levmic, when, as discussed below, L. Sigal works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used Milasig and Levmic to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iv)     Defendant V. Sherapova is listed on paper as the owner, operator, and controller of Junato and Vigull, when, as discussed below, V. Sherapova works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used Junato and Vigull to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(v)      Defendants A. Berchansky is listed on paper as the owners, operators, and controllers of Nalator and Tiarillie, when, as discussed below, A. Berchansky works for one of the John Doe Defendants who secretly controls and profits from all the DME Providers, and used Nalator and Tiarillie to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(vi)     John Doe Defendants "1" - "10" (the "John Doe Defendants") are citizens of New York and are presently not identifiable but are: (i) secretly controlling and profiting from the DME Providers; (ii) associated with the Referring Providers and various multi-disciplinary medical offices that purportedly treat high-volume of No-Fault insurance patients (the "Clinics") and are the sources of prescriptions to the DME Providers; and/or (iii) conspired with the Paper Owner Defendants to further the fraudulent schemes against GEICO and other automobile insurers.

4. As discussed below, the Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i) The bills for Fraudulent Equipment submitted by the Defendants to GEICO fraudulently misrepresented that the Defendants complied with all local licensing requirements when the Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection (formerly Department of Consumer Affairs), as they misrepresented the ownership and business premises address for each of the DME Providers;

(ii) The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – based upon bogus prescriptions, including photocopied prescriptions, received as a result of unlawful financial arrangements between the Defendants and others who are not presently identifiable and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(iii) The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent provided – pursuant to predetermined fraudulent protocols designed by the Defendants and others not presently identifiable to GEICO, which was solely to financially enrich the Defendants and others not presently known, rather than to treat or otherwise benefit the Insureds;

(iv) The Fraudulent Equipment was provided – to the extent provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(v) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds; and

(vi) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

5. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Providers.

6.     The charts attached hereto as Exhibits "1" through "10", set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme through Medigna, Milasig, Levmic, Mednavet, Nalator, Junato, Nayuvito, Tiarillie, Vigull and Mattana.

7.     Though Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry has been ongoing for many years, through this action GEICO seeks recovery in this action for claims with dates of service as of January 2018 to the present, as the scheme has continued uninterrupted since that time.

8.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1.1 million.

## THE PARTIES

### I.     Plaintiffs

9.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.     Defendants

10.     Defendant L. Medvid resides in Miami-Dade County and is a citizen of Florida and is listed as the paper owner of Medigna, Mednavet, Nayuvito, and Mattana.

11.     Defendant Medigna is a New York corporation with its principal place of business in Brooklyn, New York, specifically 622 Avenue X, Brooklyn, NY (the "Avene X Address"). Medigna was incorporated on January 11, 2017, and is owned on paper and purportedly operated and controlled by L. Medvid. In actuality, one of the John Doe Defendants secretly controls and

profits from Medigna and, with the aid of L. Medvid, used Medigna as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

12.     Defendant Mednavet is a New York corporation with its principal place of business at the Avenue X Address. Mednavet was incorporated on October 5, 2020, and is owned on paper and purportedly operated and controlled by L. Medvid. In actuality, one of the John Doe Defendants secretly controls and profits from Mednavet and, with the aid of L. Medvid, used Mednavet as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Nayuvito is a New York corporation with its principal place of business at the Avene X Address. Nayuvito was incorporated on May 4, 2017, and is owned on paper and purportedly operated and controlled by L. Medvid. In actuality, one of the John Doe Defendants secretly controls and profits from Nayuvito and, with the aid of L. Medvid, used Nayuvito as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14.     Defendant Mattana is a New York corporation with its principal place of business at the Avene X Address. Mattana was incorporated on July 7, 2023, and is owned on paper and purportedly operated and controlled by L. Medvid. In actuality, one of the John Doe Defendants secretly controls and profits from Mattana and, with the aid of L. Medvid, uses Mattana as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

15.     Defendant L. Sigal resides in Queens County and is a citizen of New York and is listed as the paper owner of Milasig and Levmic.

16.     Defendant Milasig is a New York corporation with its principal place of business at the Avenue X Address. Milasig was incorporated on January 29, 2019, and is owned on paper and purportedly operated and controlled by L. Sigal. In actuality, one of the John Doe Defendants

secretly controls and profits from Milasig and, with the aid of L. Sigal, used Milasig as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

17.     Defendant Levmic is a New York Corporation with its principal place of business at 2500 65th Street, Brooklyn, NY (the "65th Street Address"). Levmic was incorporated on February 14, 2020, and is owned on paper and purportedly operated and controlled by L. Sigal. In actuality, one of the John Doe Defendants secretly controls and profits from Levmic and, with the aid of L. Sigal, used Levmic as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

18.     Defendant V. Sherapova resides in Kings County and is a citizen of New York and is listed as the paper owner of Junato and Vigull.

19.     Defendant Junato is a New York Corporation with its principal place of business at the Avenue X Address. Junato was incorporated on October 8, 2021, and is owned on paper and purportedly controlled and operated by V. Sherapova. In actuality, one of the John Doe Defendants secretly controls and profits from Junato and, with the aid of V. Sherapova, used Junato as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

20.     Defendant Vigull is a New York Corporation with its principal place of business at the 65th Street Address. Vigull was incorporated on March 8, 2023, and is owned on paper and purportedly controlled and operated by V. Sherapova. In actuality, one of the John Doe Defendants secretly controls and profits from Vigull and, with the aid of V. Sherapova, used Vigull as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

21.     Defendant A. Berchansky resides in Richmond County and is a citizen of New York and is listed as the paper owner of Nalator and Tiarillie.

22.     Defendant Nalator is a New York corporation with its principal place of business at the 65th Street Address. Nalator was incorporated on February 21, 2021, and is owned on paper and purportedly operated and controlled by A. Berchansky. In actuality, one of the John Doe Defendants secretly controls and profits from Nalator and, with the aid of A. Berchansky, used Nalator as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

23.     Defendant Tiarillie is a New York corporation with its principal place of business at 7819 Bay Parkway, Brooklyn, New York (the "Bay Parkway Address"). Tiarillie was incorporated on October 19, 2022, and is owned on paper and purportedly operated and controlled by A. Berchansky. In actuality, one of the John Doe Defendants secretly controls and profits from Tiarillie and, with the aid of A. Berchansky, used Tiarillie as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

25.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

26.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

27.     GEICO underwrites automobile insurance in the State of New York.

**I.      An Overview of the Pertinent Laws**

**A.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

28.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

29.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

30.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

31.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

32.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

33.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

34.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

35.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

36.     Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection, formerly Department of Consumer Affairs, ("DCWP") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

37.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

38.     A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME/OD supplier is physically operating from.

39.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

40.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

41.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

42.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

43.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

44.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

45.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

46.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

47.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can

include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

48. OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

49. To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

50. In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

51. As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

(a) The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

52.     As indicated by the New York Fee Schedule, up to April 4, 2022, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

53.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

54.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

55.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.

56.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

57.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

58.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items that are identified by HCPCS Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

59.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

60.     The maximum reimbursement rates for providing DME or OD to automobile accident victims under the No-Fault Laws set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c). As such, DME/OD suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME or OD.

61.     In an effort to reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York

State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

62. Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

63. Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

64. However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

65. For all charges after April 4, 2022, as it relates to Non-Fee Schedule items that are provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public. See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

66. Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

      (i)      The provider is in compliance with all significant statutory and regulatory requirements;

(ii)     The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The prescription for DME or OD is not based any unlawful financial arrangement;

(iv)     The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(v)      The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(vi)     The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item.

## II.     The Defendants' Fraudulent Scheme

### A.     The DME Providers' Common Secret Ownership

67.     The John Doe Defendants conspired with the Paper Owner Defendants to implement a complex fraudulent scheme in which the DME Providers were used consecutively and in conjunction with each other over the course of several years to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

68.     While each of the DME Providers were formed and listed as being owned by one of the Paper Owner Defendants, all of the DME Providers were actually controlled by John Doe Defendant 1, who is not presently identifiable to GEICO (hereinafter, the "Secret Owner"), who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

69.     The Secret Owner was able to secretly control and profit from the DME Providers by using each of the Paper Owner Defendants as "straw" owners who would place their name on

documents needed to be filed with the State of New York and City of New York to lawfully operate the DME Providers.

70.      In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the various DME Providers that could only exist through the Secret Owner's involvement.

71.      For example, each of the following entities purportedly operated from the Avenue X Address, despite being purportedly owned and operated by different Paper Owner Defendants: (i) Medigna, Mednavet, Nayuvito, and Mattana, which are purportedly owned by L. Medvid; (ii) Milasig, which is purportedly owned by L. Sigal; and (iii) Junato, which is purportedly owned by V. Sherapova.

72.      Similarly, each of the following entities purportedly operated from the 65th Street Address, despite being purportedly owned and operated by different Paper Owner Defendants: (i) Levmic, which is purportedly owned by L. Sigal; (ii) Vigull, which is purportedly owned by V. Sherapova; and (iii) Nalator, which is purportedly owned by A. Berchansky.

73.      In further support of the fact that the DME Providers were operated by the Secret Owner as part of a common scheme, both Junato (purportedly owned by V. Sherapova and operated from the Avenue X Address) and Tiarille (purportedly owned by A. Berchansky and operated from the Bay Parkway Address) used the same phone number, 917-642-1675, on their Dealer in Products license applications.

74.      The Secret Owner, together with the Paper Owner Defendants, operated the DME Providers in the following sequential fashion in an effort to limit the amount of billing submitted from any one of the DME Providers and mask the common fraudulent scheme:

(i)     Medigna billed GEICO for dates of service between January 16, 2017 and April 8, 2019;

(ii)     Milasig billed GEICO for dates of service between March 18, 2019 and March 10, 2020;

(iii)     Levmic billed GEICO for dates of service between February 20, 2020 and December 31, 2020;

(iv)     Mednavet billed GEICO for dates of service between October 6, 2020 and May 19, 2021;

(v)     Nalator billed GEICO for dates of service between February 24, 2021 and August 17, 2021;

(vi)     Junato billed GEICO for dates of service between October 11, 2021 and March 1, 2022;

(vii)     Nayuvito billed GEICO for dates of service between May 6, 2022 and August 19, 2022;

(viii)     Tiarillie billed GEICO for dates of service between November 21, 2022 and January 31, 2023;

(ix)     Vigull billed GEICO for dates of service between March 15, 2023 and June 6, 2023; and

(x)     Mattana billed GEICO for dates of service between August 24, 2023 and at least October 10, 2023.

75.     Similarly, and as part of the common scheme, based on the unlawful financial arrangements between the Secret Owner, the Paper Owner Defendants, and others who presently identifiable but who are affiliated with the Clinics, the DME Providers each received virtually identical prescriptions for Fraudulent Equipment from multiple Clinics in the New York metropolitan area. For example:

(i)     Medigna, Milasig, and Levmic each received virtually identical prescriptions for Fraudulent Equipment from the Clinic located at 3910 Church Avenue, Brooklyn, New York ("the Church Ave. Clinic");

(ii)    Medigna and Milasig each received virtually identical prescriptions for Fraudulent Equipment from the Clinic located at 5506 Avenue N, Brooklyn, New York;

(iii)    Mednavet, Junato, Nayuvito, and Vigull each received virtually identical prescriptions for Fraudulent Equipment from the Clinic located at 2184 Flatbush Avenue, Brooklyn, New York;

(iv)    Mednavet, Nalator, Junato, Nayuvito, Tiarillie, Vigull, and Mattana each received virtually identical prescriptions for Fraudulent Equipment from the Clinic located at 245 Rockaway Avenue, Valley Stream, New York (the Rockaway Ave. Clinic"); and

(v)    Mednavet, Nalator, Junato, Levmic, Nayuvito, Milasig, Tiarillie, and Vigull each received virtually identical prescriptions for Fraudulent Equipment from the Clinic located at 599-601 Southern Boulevard, Bronx, New York.

76.    These are only representative examples.

77.    Further, as part of the On Paper and Secret Owners' efforts to mask the Secret Owner's control of the DME Providers , GEICO attempted to verify the claims submitted by the Defendants by way of examinations under oath, but the On Paper Defendants intentionally refused to appear because they would be unable to answer key questions about the DME Providers' operations and their testimony would reveal the secret ownership scheme.

78.    Additionally, and as discussed further below, the DME Providers each billed GEICO using virtually identical HCPCS Codes in response to the prescriptions from Fraudulent Equipment they received, and the DME Providers each made virtually the same coding misrepresentations in their billing to GEICO.

**B.    Overview of the Common Fraudulent Scheme**

79.    The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which they used the DME Providers as vehicles to

bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits which the Defendants were never entitled to receive.

80. To maximize the amount of no-fault benefits the Defendants could receive, the Secret Owner along with the Paper Owner Defendants, used the DME Providers in sequential fashion to divide the billing that they were submitting to no-fault insurance carriers, including GEICO.

81. In keeping with the fact that that Defendants split up their billing in order maximize the amount of no-fault benefits they could collect, the DME Providers operated in sequential order, typically with some overlap to allow more than one entity to bill no-fault insurance carriers, including GEICO, at a single time.

82. Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the DME Providers to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect. Specifically:

> (i) Between January 2018 and April 2019, Medigna submitted more than $818,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $560,000.00, and there is more than $87,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;
>
> (ii) Between March 2019 and March 2020, Milasig submitted more than $327,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $80,000.00, and there is more than $45,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;
>
> (iii) Between February 2020 and December 2020, Levmic submitted more than $327,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $51,000.00, and there is more than $45,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;
>
> (iv) Between October 2020 and May 2021, Mednavet submitted more than $417,000.00 in fraudulent claims to GEICO, has wrongfully obtained

more than $54,000.00, and there is more than $265,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;

(v)     Between February 2021 and August 2021, Nalator submitted more than $485,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $38,000.00, and there is more than $340,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;

(vi)    Between October 2021 and March 2022, Junato submitted more than $366,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $156,000.00, and there is more than $175,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;

(vii)   Between May 2022 and August 2022, Nayuvito submitted more than $391,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $84,000.00, and there is more than $260,000.00 in additional fraudulent claims that have yet to be adjudicated but which the Defendants continue to seek payment of from GEICO;

(viii)  Between November 2022 and January 2023, Tiarillie submitted more than $287,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $57,000.00, and there is more than $220,000.00 in additional fraudulent claims that have yet to be adjudicated;

(ix)    Between March 2023 and June 2023, Vigull submitted more than $224,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $21,000.00, and there is more than $190,000.00 in additional fraudulent claims that have yet to be adjudicated; and

(x)     Between August 2023 and October 2023, Mattana submitted more than $200,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $47,000.00, and there is more than $149,000.00 in additional fraudulent claims that have yet to be adjudicated.

83.     The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of improper agreements with third-party individuals associated with the Clinics who are not presently identifiable (the "Clinic Controllers").

84.     As part of this scheme, the Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by various Referring Providers who purportedly treated Insureds at the various Clinics.

85.     As also part of this scheme, the Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by Referring Providers during their treatment at a Clinic.

86.     None of the Defendants marketed or advertised the DME Providers to the general public, and they lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

87.     Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

88.     Instead, the Defendants entered illegal, collusive agreements with the Clinics, Clinic Controllers, and Referring Providers and steered them to prescribe and direct large volumes of the same prescriptions (or purported prescriptions) to the DME Providers for the specifically targeted Fraudulent Equipment.

89.     Defendants received the prescriptions for Fraudulent Equipment, purportedly issued by the Referring Providers as part of the unlawful financial arrangements with the Clinic Controllers, directly from the Clinics and without going through the Insureds.  Many of these prescriptions were bogus and contained a duplicated signature of the Referring Provider who purportedly issued the prescription.

90.     As part of the scheme, and in a way to maximize the amount of money that the Defendants could obtain from GEICO, and other automobile insurers, the prescriptions for Fraudulent Equipment that were purportedly issued by the Referring Providers and provided to the Defendants were generic and vague.

91.     Once the Defendants received the prescriptions purportedly issued by the Referring Providers, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified in the prescriptions or that differed from the HCPCS Codes that were identified in the prescriptions.

92.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a Referring Provider, who was licensed to prescribe DME and/or OD.

93.     However, the Defendants tried to maximize the amount of No-Fault Benefits that they could obtain from GEICO, and other automobile insurers, by submitting bills to GEICO for Fraudulent Equipment that was never actually provided to Insureds by misrepresenting the HCPCS Codes identified in the bills submitted to GEICO by the Defendants.

94.     In a substantial majority of the charges for Fee Schedule items identified in Exhibits "1" through "10" – to the extent that any Fraudulent Equipment was actually provided to the Insureds – the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted to GEICO by the Defendants.

95.     Based on the false and medically unnecessary prescriptions, each of the Defendants engaged in a virtually identical pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

96.     Instead, the Fee Schedule items actually provided to Insureds – and again to the extent that any Fraudulent Equipment was actually provided – would qualify under different HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes identified in the bills submitted by the Defendants.

97.     In furtherance of their scheme to defraud GEICO and other automobile insurers, the Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the <u>lesser</u> of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

98.     In actuality, the bills from the Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

99.     As a further part of this scheme, the Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds were expensive and high-quality, when the Fraudulent Equipment provided were cheap and poor-quality, and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

100.     In fact, the cheap and poor-quality Fraudulent Equipment provided to the Insureds – again, to the extent that any Fraudulent Equipment was actually provided – were easily

obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by the Defendants.

101.    After obtaining the vague and generic prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers as a result of paying various forms of consideration, the Defendants would bill GEICO through the different DME Providers for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; (iv) Fraudulent Equipment at grossly inflated reimbursement rates; and (v) Fraudulent Equipment that was otherwise not reimbursable.

102.    In an effort to hide the extent of their fraudulent acts against GEICO, the Defendants each also submitted multiple bills to GEICO for purportedly making repeated home deliveries of Fraudulent Equipment to Insureds based upon the prescriptions for Fraudulent Equipment generated by the Clinics and Referring Providers.

103.    The Defendants submission of multiple bills to GEICO based upon a single prescription representing that they delivered Fraudulent Equipment to Insureds over the course of several dates was in reality designed to further mask the fraudulent scheme and an effort to keep the individual totals on each bill artificially lower and avoid detection by GEICO, when, to the extent that any Fraudulent Equipment was actually provided, the Insureds received the Fraudulent Equipment directly from the Clinics on a single date and without any involvement by the Defendants.

**C.**      **Defendants Failure to Comply with Local Licensing Provisions**

104.    As stated above, for a DME/OD supplier to provide DME or OD to automobile accident victims within the City of New York, the DME/OD supplier must obtain a Dealer in Products License by the DCWP.

105.    For the Defendants to lawfully provide DME/OD to the Insureds identified in Exhibits "1" through "10", the DME Providers were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" through "10" were located within the City of New York.

106.    As part of the Defendants scheme to defraud GEICO and other Insurers, the Defendants sought Dealer in Products Licenses from the DCWP in an effort to have almost all of the DME Providers appear to be legitimate.

107.    However, each of the DME Providers were not eligible to collect No-Fault Benefits from GEICO, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME or OD to Insureds.

108.    For example, Nalator, was not eligible to collect No-Fault Benefits because Nalator never obtained a Dealer in Products license issued by the DCWP.

109.    In addition, the remaining nine (9) DME Providers were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses through fraud and/or misrepresentations.

110.    As part of obtaining a Dealer in Products License, each of the DME Providers (excluding Nalator which never applied for a Dealer in Products License), completed a license application form that required it to identify – among other things – the commercial address of where each physically operated from.

111.    Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 175.35 of New York's Penal Law.

112.    However, and in support of the fact that the Defendants scheme to defraud GEICO and other automobile insurers of No-Fault Benefits, the Paper Owner Defendants each knowingly provided false information in their Dealer in Products License applications filed on behalf of the DME Providers.

113.    Specifically, the following Paper Owners each falsely affirmed that the DME Providers operated from the Avenue X Address knowing that the following entities did not actually operate or conduct any business from that address: (i) L. Medvid falsely affirmed that Medigna, Mednavet, Nayuvito, and Mattana each operated out of the Avenue X Address; (ii) L. Sigal falsely affirmed that Milasig operated out of the Avenue X Address; and (iii) V. Sherapova falsely affirmed that Junato operated out of the Avenue Address.

114.    In addition, the following Paper Owners each falsely affirmed that the DME Providers operated from the 65th Street Address knowing that the following entities did not actually operate or conduct any business from that address: (i) L. Sigal falsely affirmed that Levmic operated out of the 65th Street Address; and (iii) V. Sherapova falsely affirmed that Vigull operated out of the 65th Street Address.

115.    Finally, A. Berchansky falsely affirmed that Tiarillie operated from the Bay Parkway Address knowing that Tiarillie did not actually operate or conduct any business from that address.

116.    In support of the fact that the Dealer in Products license applications contained false affirmations, GEICO investigators visited the Avenue X Address in February 2022 and observed this address is the location for "Professional Alterations, Inc.", a tailor shop specializing in

alterations to women's clothing. SIU observed a closed door located inside Professional Alterations, Inc. with a Dealer in Products license for Junato taped to the outside and was told by one of the tailors that this is a small room rented out to a Caucasian male in his 50s who visits the location about once a month.

117.    In May 2023, GEICO investigators visited the 65th St. Address and observed it to be a law office. There was no signage to indicate any of the DME Providers operated from this address and did not appear to the GEICO investigators that any DME company operated from this location. When GEICO investigators spoke with the law office receptionist, they were told that Vigull rents a space in the office but does not service any customers from this address.

118.    In addition, in January 2023 GEICO investigators visited the Bay Parkway Address in an attempt to locate Tiarillie. They observed a medical office and spoke with a receptionist who stated that Tiarillie rents space from this location provided the GEICO investigators with a phone number for A. Berchansky, 917-642-1675, the same phone number used by Junato (purportedly owned by V. Sherapova). GEICO investigators subsequently contacted A. Berchansky using this phone number, who stated he rents an office at the Bay Parkway Address, but his supplies are kept in a warehouse in Brooklyn. However, A. Berchansky was unable to name or describe for GEICO investigators where in Brooklyn this warehouse was allegedly located.

119.    In further support of the fact that the DME Providers were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses under false pretenses, each of the Paper Owners affirmed on their license applications, under penalty for false statements, that they were the sole owner of each respective DME Provider.

120. In reality, as set forth above, the DME Providers were actually controlled by the Secret Owner, and who directly profited from the fraudulent scheme committed through the DME Providers.

121. The Paper Owners knowingly provided false information regarding their business addresses and ownership to induce the DCWP to issue licenses to them, which would give the Defendants the appearance of legitimacy and provide them with the opportunity to submit fraudulent billing to GEICO and other Insurers through the DME Providers.

122. Accordingly, Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME/OD supplier within the City of New York without a valid Dealer in Products License.

123. In each of the claims identified in Exhibits "1" through "10" the Defendants fraudulently misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME/OD to Insureds when the Defendants were never eligible to collect No-Fault Benefits in the first instance because: (i) Nalator failed to apply for or obtain a Dealer in Products license; and (ii) Medigna, Mednavet, Milasig, Junato, Nayuvito, Mattana, Levmic, Vigull, and Tiarillie did not lawfully obtain Dealer in Products Licenses by receiving their Dealer in Products licenses under the false pretenses described above.

**D.     The Defendants' Unlawful Financial Arrangements**

124. To obtain access to Insureds as part of their fraudulent scheme and maximize the No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into unlawful financial agreements with others who are not presently identifiable but who are associated with the Clinics where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

125. Since the inception of the Defendants' fraudulent scheme, the Defendants engaged in unlawful financial arrangements with the Clinic Controllers to obtain prescriptions for Fraudulent Equipment. These schemes allowed the Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

126. As part of the unlawful financial arrangements, the Defendants would pay others who are not presently identifiable, including fictitious businesses, to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers at the Clinics.

127. The Defendants were able to enter unlawful financial arrangement schemes with the Clinic Controllers in order to obtain prescriptions purportedly issued by the Referring Providers because the Referring Providers operated at Clinics that are actually organized as "one-stop" shops for no-fault insurance fraud.

128. These Clinics provide facilities for the Referring Providers, as well as a "revolving door" of medical professional corporations, all geared towards exploiting New York's no-fault insurance system.

129. In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that start and stop operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

130. For example, since 2018, GEICO has received billing from the Church Ave. Clinic, which was a source of prescriptions for Fraudulent Equipment routed to Medigna, Milasiag and

Levmic and used as a basis to submit bills to GEICO, from a "revolving door" of over 170 different healthcare providers.

131.     Further, since 2018, GEICO has received billing from the 599-601 Southern Boulevard, Bronx, New York Clinic, which was a source of prescriptions for Fraudulent Equipment routed to Mednavet, Nalator, Levmic, Junato, Nayuvito, Milasig, Tiarillie, and Vigull and used as a basis to submit bills to GEICO, from a "revolving door" of over 80 different healthcare providers.

132.     Additionally, since 2020, GEICO has received billing from the Rockaway Ave. Clinic, which was a source of prescriptions for Fraudulent Equipment routed to Mednavet, Nalator, Junato, Nayuvito, Tiarillie, Vigull, and Mattana and used as a basis to submit bills to GEICO, from a "revolving door" of over 60 different healthcare providers.

133.     Pursuant to the unlawful financial arrangements, the Defendants paid others that are not presently known who are associated with the Clinics, and who were able to direct prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers to the Defendants, which the Defendants used as a basis to support their fraudulent bills to GEICO.

134.     In support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, and as explained in detail below, the prescriptions were not medically necessary, were provided pursuant to predetermined fraudulent protocols that provided Insureds with predetermined sets of virtually identical Fraudulent Equipment, and frequently never actually issued by the Referring Provider.

135.     In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment were not medically unnecessary and provided pursuant to predetermined fraudulent protocols and, the Defendants: (i) received virtually identical predetermined sets of prescriptions

from multiple Referring Providers operating out of the same Clinic; and (ii) obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

136. Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from the Clinics, typically from the receptionists, without any involvement from the Defendants.

137. In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment that were never actually issued by the Referring Provider, as described in more detail below, the DME Providers submitted bills to GEICO based upon prescriptions for Fraudulent Equipment that: (i) contained a photocopied signature or used a signature stamp of the Referring Provider; (ii) were undated; and/or (iii) were issued on a date that the Insured was not treated by the Referring Provider who purportedly issued the prescription.

138. In all of the claims identified in Exhibits "1" through "10", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

E.     The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols

139. In addition to the Defendants' unlawful financial arrangements, pursuant to agreements with others who are not presently identifiable, the Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers but where issued pursuant to predetermined fraudulent protocols, which were designed to maximize the billing that the Defendants – and others – could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

140.     In the claims identified in Exhibits "1" through "10", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

141.     Concomitantly, almost none of the Insureds identified in Exhibits "1" through "10", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

142.     In keeping with the fact that the Insureds identified in Exhibits "1" through "10" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidently, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

143.     To the extent that the Insureds in the claims identified in Exhibits "1" through "10" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

144.     However, despite virtually all the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers were subject to extremely similar treatment including nearly identical prescriptions for Fraudulent Equipment.

145.     The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" through "10" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

146.     For example, virtually all of the Insureds were prescribed orthotic devices after their low-speed and low-impact motor vehicle accidents when such orthotic devices are – in a legitimate setting – only provided after appropriate consideration for a specific, documented, and corelated condition to patients.

147.     No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

148.     In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

(i)      an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

(ii)     the Insured would be seen by a Referring Provider;

(iii)    on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD;

(iv)     subsequently, the Insured would return to the Clinic for one or more additional evaluations and treatment by other healthcare providers, and would be provided with at least one additional prescription for a predetermined set of DME and/or OD, although the Referring Provider did not always treat the Insured on the date of the additional prescription for DME and/or OD; and

(v)      at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Defendants to fill and was without any involvement by the Insured.

149.     Virtually all of the claims identified in Exhibits "1" through "10" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

150.     In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

151.     Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider <u>may</u> – but generally does not – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

152.     In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

153.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

154.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

155.     If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation

report, what specific DME and/or OD was prescribed, why it was medically necessary, or how it would help the Insureds.

156.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

157.    It is improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" through "10" who treated with at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

158.    It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" through "10" who treated with different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

159.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" through "10" that treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment.

160.    While the specific preset prescriptions of Fraudulent Equipment varied based upon the specific Clinic that the Insured visited, there were multiple items of Fraudulent Equipment that

were purportedly prescribed to virtually all the Insureds identified in Exhibits "1" through "10" regardless which Clinic the insureds visited.

161.     In also in keeping with the fact that the prescriptions for Fraudulent Equipment used by the Defendants were medically unnecessary and obtained as part of a predetermined fraudulent protocol, many of the prescriptions were purportedly issued by the Referring Providers on dates that the Insureds never even treated with the Referring Providers.

162.     Also, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "10" were issued pursuant to predetermined fraudulent protocols and not for the benefit of the Insureds, as set forth below, the Referring Providers issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

163.     The multiple checkmark-based prescriptions issued by the Referring Providers to an Insured on the same date was part of a predetermined fraudulent protocol that was designed to allow the Defendants to submit multiple bills to GEICO for Fraudulent Equipment in an effort to artificially lower the total dollar amount submitted on each bill and avoid detection.

164.     In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" through "10".

165.    In also keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" through "10" were not medical necessity but were the result of a predetermined fraudulent protocol, the prescriptions often contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME or OD they wanted.

166.    Even more, and as also explained below in more detail, the charges to GEICO identified in Exhibits "1" – "10" were not based upon prescriptions for medically necessary Fraudulent Equipment because the Defendants purportedly provided Insureds with whatever DME or OD they wanted, as the Fraudulent Equipment purportedly provided by each of the DME Defendants – and billed to GEICO – was often not the item identified in the prescriptions purportedly issued by the Referring Providers.

167.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" - "10" were issued because of predetermined fraudulent protocols and not based upon medical necessity, many of the prescriptions identified in Exhibits "1" - "10" were not actually issued by the Referring Provider listed on the prescription. Instead, in those circumstances, the prescriptions were issued by others who are not presently identifiable, without the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions.

168.    For example, and in support of the fact that the prescriptions for Fraudulent Equipment used by the Defendants to support the charges identified in Exhibits "1" though "10" were medically unnecessary and obtained as part of a predetermined fraudulent protocol, many of the prescriptions that were purportedly issued by Referring Providers contained a photocopied signature or a signature stamp of the Referring Providers.

169.     In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "10" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

170.     Instead, the Insureds were often provided with Fraudulent Equipment directly from the Clinic's receptionists, without any interaction from the Defendants – to the extent that the Insureds actually received any Fraudulent Equipment – and the prescriptions were routed directly to the Defendants from the Clinics.

171.     For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1" through "10", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

**1)     The Predetermined Fraudulent Protocol at the Church Ave. Clinic**

172.     The Church Ave. Clinic was one of the Clinics where the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

173.     After their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds who purportedly received Fraudulent Equipment from Medigna, Milasig, and Levmic and identified in Exhibits "1" – "3" purportedly received treatment from a variety of healthcare professionals who operated out of the Church Ave. Clinic.

174. These Referring Providers included (i) Quazi Rahman, M.D. ("Rahman"); (ii) Wei Hong Xu, N.P ("Xu"); (iii) Alford Smith, M.D. ("Smith"); (iv) Muhammad Zakaria, M.D. ("Zakaria"); (v) and Matthew Prince, N.P. ("Prince").

175. Rahman was named as defendant for participating in a No-Fault insurance scheme wherein it was alleged Rahman issued prescriptions for DME that were medically unnecessary and part of a predetermined treatment protocol in GEICO v. Longevity Med. Supply, Inc., et al.; Index No.: 1:20-cv-01681 (RPK)(VMS) (E.D.N.Y 2020).

176. Similarly, Prince was the Referring Provider in DME prescriptions across multiple affirmative fraud cases filed by GEICO, including GEICO v. ALP Supply, Inc., et al., Index No.: 1:22-cv-00079 (LDH)(MMH) (E.D.N.Y 2022); GEICO v. Cavallaro Med. Supply, Inc., et al.; Index No.: 1:21-cv-06757 (ARR)(PK) (E.D.N.Y 2021); GEICO v. Igor Tolmasov, et al.; Index No.: 1-21-cv-07058 (KAM)(PK) (E.D.N.Y 2021).

177. Virtually every Insured identified in Exhibits "1" – "3" who purportedly received treatment at the Church Ave. Clinic was provided with an initial examination from a healthcare provider. After their purported initial examination, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

178. When the Insureds sought treatment with and were purportedly provided with an initial evaluation by healthcare providers at the Church Ave. Clinic, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

179. Rather, Referring Providers at the Church Ave. Clinic purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

180.    In keeping with the fact that the prescriptions issued to the Insureds by Referring Providers at the Church Ave. Clinic after purported initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, the Referring Providers never evaluated each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD would aid in each Insured's treatment.

181.    Instead, and in keeping with the fact that the prescriptions issued to the Insureds after their initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, virtually every Insured who underwent an initial examination at the Church Ave. Clinic received a prescription for virtually the same type of Fraudulent Equipment.

182.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the Church Ave. Clinic, Referring Providers virtually always prescribed the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber (sp) cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; and (viii) a "Water circulation cold/hot pad".

183.    As part of the predetermined fraudulent protocol where prescriptions for Fraudulent Equipment were issued to the Insureds identified in Exhibits "1" - "3," if the Insureds returned to the Church Ave. Clinic for further treatment, the Insureds would virtually always be provided with at least one or more additional prescriptions for a predetermined set of Fraudulent Equipment purportedly issued by the Referring Providers.

184.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, the Insureds identified in Exhibits "1" and "2" that continued treatment at the Church Ave. Clinic were virtually always prescribed the following Fraudulent Equipment: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa Red (sp) lamp".

185.    In addition to the items prescribed to virtually every Insured who continued treatment at the Church Ave. Clinic, as part of the predetermined fraudulent protocols, the Insureds were also provided with separate additional prescriptions for Fraudulent Equipment that virtually always included at least one of following: (i) a "Traction cervical frame with pump"; (ii) a "LSO APL (Custom Fitted)"; (iii) a "Shoulder support (Custom Fitted)"; and/or (iv) a "Knee support (Custom Fitted)".

186.    In keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave. Clinic were fraudulently issued by unidentifiable third-party individuals, issued as part of a predetermined fraudulent protocol, and issued without medical necessity, virtually every Insured who treated at the Church Ave. Clinic was issued at least one prescription for Fraudulent Equipment that was dated on a day that the Insureds was not examined or otherwise treated by the Referring Provider who purportedly issued the prescription.

187.    In also keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave. Clinic were fraudulently issued by unidentifiable third-party individuals and not the Referring Providers whose names were on the prescriptions, many of the Insureds identified in Exhibits "1" - "3" received multiple separate prescriptions for Fraudulent Equipment on a single date that were purportedly issued by the same Referring Provider.

188.     Upon information and belief, multiple separate prescriptions were issued to the Insureds on a single date, and purportedly by the same Referring Provider, as part of the scheme between the Defendants and unidentifiable third-party individuals to provide the Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to lower the amount charged to GEICO on each bill so the Defendants could avoid detection of their fraudulent schemes.

189.     In keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to Insureds were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, there was no legitimate reason for a single Referring Provider to issue multiple prescriptions for Fraudulent Equipment to a single Insured on the same date. The multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription as each prescription used the same checkmark-based form containing a list of DME/OD.

190.     There is no legitimate reason why any healthcare provider would need to issue multiple prescriptions to an individual Insured on a single date that used the same checkmark-based form. Even more, there is no legitimate reason why this would occur in a substantial amount of the Insureds identified in Exhibits "1" - "3" who treated at the Church Ave. Clinic.

191.     In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave. Clinic were fraudulently issued by unidentifiable third-party individuals, issued as part of a predetermined fraudulent protocol, and issued without medical necessity, the prescriptions issued to the Insureds who treated at the Church Ave. Clinic were virtually identical regardless of which Referring Provider purportedly issued the prescriptions.

192.     Even more, the predetermined fraudulent protocols established at the Church Ave. Clinic where Insureds were provided with multiple prescriptions for virtually identical Fraudulent

Equipment were not isolated to prescriptions provided to the Defendants. In many circumstances, the prescriptions for the Insureds identified in Exhibits "1" – "3" were provided to DME Defendants Medigna, Milasig, and/or Levmic *and* to other DME/OD suppliers.

193.    For example:

(i)      On September 26, 2018, an Insured named TF was purportedly involved in a motor vehicle accident. TF purportedly started treating at the Church Ave. Clinic with Rahman on September 26, 2018. After Rahman purportedly performed an initial examination on TF, Rahman purportedly issued a prescription in the name of TF that was provided to another DME supplier that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; (viii) a "Water circulation cold/hot pad"; and (ix) an "Orthopedic car seat". On December 17, 2018, after a purported follow-up examination with Rahman, Rahman purportedly issued an undated prescription in the name of TF that was provided to **Medigna** for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". Rahman also purportedly issued two separate undated prescriptions in the name of TF that were both provided to **Medigna** for: (i) a "LSO APL (Custom Fitted)"; and (ii) a "Traction cervical frame with pump";

(ii)     On October 9, 2018, an Insured named CC was purportedly involved in a motor vehicle accident. CC purportedly started treating at the Church Ave. Clinic with Rahman on October 10, 2018. After Rahman purportedly performed an initial examination on CC, Rahman purportedly issued a prescription in the name of CC that was provided to another DME supplier that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; (viii) a "Water circulation cold/hot pad"; and (ix) an "Orthopedic car seat". On January 11, 2019, after a purported follow-up examination with Rahman, Rahman purportedly issued an undated prescription in the name of CC that was provided to **Medigna** for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp";

(iii)    On October 9, 2018, an Insured named AB was purportedly involved in a motor vehicle accident. AB purportedly started treating at the Church Ave. Clinic with Rahman on October 17, 2018. After Rahman purportedly performed an initial examination on AB, Rahman purportedly issued a prescription in the name of AB that was provided to another DME supplier

that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; (viii) a "Water circulation cold/hot pad"; and (ix) an "Orthopedic car seat". On October 26, 2018, Rahman purportedly issued a prescription in the name of AB that was provided to another DME supplier for a "Knee support (Custom Fitted) – Rt", despite Rahman not performing any examination or treatment on AB on that date. On November 14, 2018, Rahman purportedly issued a prescription in the name of AB that was provided to another DME supplier for a "Traction cervical frame w/ pump", despite Rahman not performing any examination or treatment on AB on that date. On March 22, 2019, after a purported follow-up examination with Rahman, Rahman purportedly issued a prescription in the name of AB that was provided to **Milasig** for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp";

(iv)     On October 26, 2018, an Insured named PM was purportedly involved in a motor vehicle accident. PM purportedly started treating at the Church Ave. Clinic with Rahman on November 30, 2018. After Rahman purportedly performed an initial examination on PM, Rahman purportedly issued an undated prescription in the name of PM that was provided to **Medigna** that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; and (viii) a "Water circulation cold/hot pad". On January 28, 2019, after a purported follow-up examination with Rahman, Rahman purportedly issued a prescription in the name of PM that was provided to another DME supplier for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". On February 13, 2019, Rahman purportedly issued a prescription in the name of PM that was provided to another DME supplier for a "Shoulder support (Custom Fitted) – Rt", despite Rahman not performing any examination or treatment on PM on that date. On March 22, 2019, Rahman purportedly issued a prescription in the name of PM that was provided to another DME supplier for a "Traction cervical frame w/ pump", despite Rahman not performing any examination or treatment on PM on that date;

(v)     On October 27, 2018, an Insured named IF was purportedly involved in a motor vehicle accident. IF purportedly started treating at the Church Ave. Clinic with Rahman on November 2, 2018. After Rahman purportedly performed an initial examination on IF, Rahman purportedly issued a prescription in the name of IF that was provided to another DME supplier that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; and (viii) a "Water circulation cold/hot pad".

On December 7, 2018, after a purported follow-up examination with Rahman, Rahman purportedly issued a prescription in the name of IF that was provided to another DME supplier for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". On December 28, 2018, Rahman purportedly issued a prescription in the name of IF that was provided to another DME supplier for a "Shoulder support (Custom Fitted) – Rt", despite Rahman not performing any examination or treatment on PM on that date. Rahman also purportedly issued two separate undated prescriptions in the name of IF that were both provided to **Medigna** for: (i) a "Knee support (Custom Fitted) - Lt"; and (ii) a "Traction cervical frame with pump";

(vi)    On November 1, 2018, an Insured named SG was purportedly involved in a motor vehicle accident. SG purportedly started treating at the Church Ave. Clinic with Rahman on November 2, 2018. After Rahman purportedly performed an initial examination on SG, Rahman purportedly issued a prescription in the name of SG that was provided to another DME supplier that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; and (viii) a "Water circulation cold/hot pad". On December 7, 2018, after a purported follow-up examination with Rahman, Rahman purportedly issued a prescription in the name of SG that was provided to another DME supplier for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". Rahman also purportedly issued two separate undated prescriptions in the name of SG that were both provided to **Medigna** for: (i) a "LSO APL (Custom Fitted)"; and (ii) a "Traction cervical frame with pump";

(vii)   On November 23, 2018, an Insured named SB was purportedly involved in a motor vehicle accident. SB purportedly started treating at the Church Ave. Clinic with Rahman on November 26, 2018. After Rahman purportedly performed an initial examination on SB, Rahman purportedly issued an undated prescription in the name of SB that was provided to **Medigna** that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; (viii) a "Water circulation cold/hot pad"; and (ix) an "Orthopedic car seat". On January 2, 2019, after a purported follow-up examination with Rahman, Rahman purportedly issued a prescription in the name of SB that was provided to another DME supplier for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp";

(viii)  On March 12, 2019, an Insured named MB was purportedly involved in a motor vehicle accident. MB purportedly started treating at the Church Ave. Clinic with Rahman on April 3, 2019. After Rahman purportedly performed

an initial examination on MB, Rahman purportedly issued a prescription in the name of MB that was provided to another DME supplier that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) an "Orthopedic car seat"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; and (viii) a "Water circulation cold/hot pad". On April 19, 2019, Rahman purportedly issued a prescription in the name of MB that was provided to **Milasig** for a "LSO APL (Custom Fitted)", despite Rahman not performing any examination or treatment on MB on that date. On June 14, 2019, after a purported follow-up examination with Smith, Smith purportedly issued a prescription in the name of MB that was provided **Milasig** for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp";

(ix)    On March 21, 2019, an Insured named LA was purportedly involved in a motor vehicle accident. LA purportedly started treating at the Church Ave. Clinic with Rahman on March 22, 2019. After Rahman purportedly performed an initial examination on LA, Rahman purportedly issued a prescription in the name of LA that was provided to **Milasig** that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; (viii) a "Water circulation cold/hot pad"; and (ix) an "Orthopedic car seat". On April 3, 2019, Rahman purportedly issued three separate prescriptions in the name of LA that were provided to a different DME supplier for: (i) a "LSO APL (Custom Fitted)"; (ii) a "TLSO Trunk Support (Custom Fitted)"; and (iii) a "Traction cervical frame with pump", despite Rahman not performing any examination or treatment on LA on that date. On April 29, 2019, after a purported follow-up examination with Zakaria, Zakaria purportedly issued a prescription in the name of LA that was provided a different DME supplier for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp";

(x)    On March 22, 2019, an Insured named LB was purportedly involved in a motor vehicle accident. LB purportedly started treating at the Church Ave. Clinic with Rahman on March 22, 2019. After Rahman purportedly performed an initial examination on LB, Rahman purportedly issued a prescription in the name of LB that was provided to **Milasig** that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; (viii) a "Water circulation cold/hot pad"; and (ix) an "Orthopedic car seat". On July 10, 2019, after a purported follow-up examination with Smith, Smith purportedly issued a prescription in the name of LB that was provided **Milasig** for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". On October 2, 2019,

49

Prince purportedly issued a prescription in the name of LB that was provided to a different DME supplier for a "Shoulder support (Custom Fitted) - Lt", despite Prince not performing any examination or treatment on LB on that date.

(xi)     On March 25, 2019, an Insured named TE was purportedly involved in a motor vehicle accident. TE purportedly started treating at the Church Ave. Clinic with Rahman on March 27, 2019. After Rahman purportedly performed an initial examination on TE, Rahman purportedly issued a prescription in the name of TE that was provided to another DME supplier that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; (viii) a "Water circulation cold/hot pad"; and (ix) an "Orthopedic car seat". On May 3, 2019, after a purported follow-up examination with Rahman, Rahman purportedly issued a prescription in the name of TE that was provided a different DME supplier for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". On May 15 2019, Rahman purportedly issued two separate prescriptions in the name of LB that were both provided to **Milasig** for: (i) a "LSO APL (Custom Fitted)"; (ii) a "Traction cervical frame with pump", despite Rahman not performing any examination or treatment on TE on that date;

(xii)    On February 23, 2020, an Insured named TP was purportedly involved in a motor vehicle accident. TP purportedly started treating at the Church Ave. Clinic with Xu on February 24, 2020. After Xu purportedly performed an initial examination on TP, Xu purportedly issued a prescription in the name of TP that was provided to another DME supplier that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; and (viii) a "Water circulation cold/hot pad". On March 13, 2020, Xu purportedly issued a prescription in the name of TP that was provided to another DME supplier for a "Shoulder support (Custom Fitted) - Lt", despite Xu not performing any examination or treatment on TP on that date. On March 25, 2020, after a purported follow-up examination with Xu, Xu purportedly issued a prescription in the name of TP that was provided to **Levmic** for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". On April 2, 2020, Xu purportedly issued two separate prescriptions in the name of TP that were both provided to **Levmic** for: (i) a "LSO APL (Custom Fitted)"; and (ii) a "Traction cervical frame with pump", despite Xu not performing any examination or treatment on TP on that date;

(xiii)   On February 28, 2020, an Insured named SS was purportedly involved in a motor vehicle accident. SS purportedly started treating at the Church Ave.

50

Clinic with Xu on March 3, 2020. After Xu purportedly performed an initial examination on SS, Xu purportedly issued a prescription in the name of SS that was provided to another DME supplier that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; and (viii) a "Water circulation cold/hot pad".  On March 20, 2020, after a purported follow-up examination with Xu, Xu purportedly issued a prescription in the name of SS that was provided to **Levmic** for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". On April 2, 2020, Xu purportedly issued a prescription in the name of SS that was provided to another DME supplier for a "Knee support (Custom Fitted) - Lt", despite Xu not performing any examination or treatment on SS on that date.  On April 17, 2020, Xu purportedly issued two separate prescriptions in the name of SS that were both provided to another DME supplier for: (i) a "LSO APL (Custom Fitted)"; and (ii) a "Traction cervical frame with pump", despite Xu not performing any examination or treatment on SS on that date;

(xiv)    On March 9, 2020, an Insured named AR was purportedly involved in a motor vehicle accident. AR purportedly started treating at the Church Ave. Clinic with Xu on March 16, 2020. After Xu purportedly performed an initial examination on AR, Xu purportedly issued a prescription in the name of AR that was provided to **Levmic** that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; and (viii) a "Water circulation cold/hot pad".  On April 13, 2020, after a purported follow-up examination with Xu, Xu purportedly issued a prescription in the name of AR that was provided to another DME supplier for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". On May 21, 2020, Xu purportedly issued three separate prescriptions in the name of AR that were all provided to another DME supplier for: (i) a "LSO APL (Custom Fitted)"; (ii) a "Traction cervical frame with pump"; and (iii) a "Knee support (Custom Fitted) - Rt", despite Xu not performing any examination or treatment on AR on that date; and

(xv)     On March 11, 2020, an Insured named JR was purportedly involved in a motor vehicle accident. JR purportedly started treating at the Church Ave. Clinic with Xu on March 18, 2020. After Xu purportedly performed an initial examination on JR, Xu purportedly issued a prescription in the name of JR that was provided to **Levmic** that included the following Fraudulent Equipment: (i) an "Orthopedic pillow"; (ii) a "Lumber cushion"; (iii) a "Cervical collar (2 pcs)"; (iv) a "Lumbosacral support (LSO)"; (v) a "Thermophore"; (vi) an "Egg crate mattress"; (vii) a "Bed board"; (viii) a "Water circulation cold/hot pad"; and (ix) and "Orthopedic car seat".  On

April 23, 2020, after a purported follow-up examination with Xu, Xu purportedly issued a prescription in the name of JR that was provided to another DME supplier for: (i) an "EMS unit"; (ii) an "EMS belt"; (iii) a "Massager"; and (iv) an "Infa red lamp". On April 24, 2020, Xu purportedly issued two separate prescriptions in the name of JR that were both provided to another DME supplier for: (i) a "LSO APL (Custom Fitted)"; and (ii) a "Traction cervical frame with pump", despite Xu not performing any examination or treatment on AR on that date.

194. These are only representative examples.

195. In fact, virtually all of the Insureds identified in Exhibits "1" – "3" that received treatment at the Church Ave. Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

196. In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from Church Ave. Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Church Ave. Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

197. In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave. Clinic were the result of a predetermined fraudulent protocol, the prescriptions for Fraudulent Equipment provided to patients at the Church Ave. Clinic were not isolated to the Insureds identified in Exhibits "1" – "3".

198. Instead, patients who sought treatment at the Church Ave. Clinic after a motor vehicle accident, including Insureds, received prescriptions for Fraudulent Equipment that are virtually identical to the above-described examples, which were then provided to one of multiple DME/OD suppliers.

199.    For example, and in keeping with the fact that the prescriptions for Fraudulent Equipment were the result of a predetermined fraudulent protocol, prescriptions for Fraudulent Equipment that are virtually identical to the prescriptions described above were issued to Insureds who treated at the Church Ave. Clinic and then provided to other DME/OD suppliers, including Cavallaro Medical Supply, Inc. ("Cavallaro"), ALP Supply, Inc. ("ALP Supply"), and PV Supply, Inc. ("PV Supply").

200.    GEICO previously sued Cavallaro in an action entitled <u>Gov't Emps. Ins. Co., et al. v. Cavallaro Med. Supply, Inc., et al.</u>, 1:20-cv-06757(ARR)(PK) (E.D.N.Y. 2020) and ALP Supply and PV Supply in an action entitled <u>Gov't Emps. Ins. Co., et al. v. ALP Supply, Inc., et al.</u>, 1:22-cv-00079(LDH)(MMH) (E.D.N.Y. 2022) wherein GEICO alleged, like the allegations here against the Defendants, that Cavallaro, ALP Supply, and PV Supply were obtaining prescriptions for Fraudulent Equipment from the Church Ave. Clinic pursuant to unlawful financial arrangements and pursuant to a predetermined fraudulent protocol.

201.    In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of a predetermined fraudulent protocol and not based upon prescriptions for medically necessary DME/OD, the prescriptions for Fraudulent Equipment that the Defendants obtained from the Church Ave are virtually the same as the prescriptions for Fraudulent Equipment that Cavallaro, ALP Supply, and PV Supply received from the Church Ave. Clinic.

202.    In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave. Clinic that were used to support the charges identified in Exhibits "1" – "3" were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as an initial examination report or a follow-up

examination report, virtually never identified all the Fraudulent Equipment purportedly prescribed to the Insureds.

203.    Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave. Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports failed to identify, sometimes in any way, the Fraudulent Equipment prescribed to Insureds, if the report identified the Fraudulent Equipment at all.

204.    To the extent that the contemporaneous reports issued by Referring Providers at the Church Ave. Clinic did reference any of the Fraudulent Equipment prescribed, the evaluation reports virtually never contained any specific detail explaining why or how the prescribed Fraudulent Equipment would benefit or aid the Insured.

205.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Church Ave. Clinic were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

206.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a

further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

207.    However, the follow-up examination reports from Referring Providers at the Church Ave. Clinic failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

208.    In further keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Church Ave. Clinic were medically unnecessary and issued provided pursuant to a predetermined fraudulent protocol, virtually all prescriptions included a prescription for a "Lumber support."  There is no item of DME or OD called a "Lumber" support, as "lumber" refers to wood that is used for construction.  There is, however, an item called a "Lumbar" support, referring to the lumbar section of the spine.  No legitimate physician, licensed healthcare provider, or professional entity would permit and sign their name to repeated prescriptions calling for a piece of lumber be prescribed to their patients.

209.    Additionally, as part of the fraudulent scheme between the Defendants and unidentified third-party individuals associated with the Church Ave. Clinic, the prescriptions from the Church Ave. Clinic were never given to the Insureds but were routed directly to the Defendants, or other DME/OD suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Church Ave. Clinic, without any interaction with or instruction concerning their use from either the Defendants or a healthcare provider.

210.    As further part of the fraudulent scheme between the Defendants and unidentified third-party individuals, the prescriptions from the Church Ave. Clinic were purposefully generic

and vague to allow the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

211. By way of example, the prescriptions do not specify a type of cervical collar or lumbosacral support that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code. Instead, the prescriptions from the Church Ave. Clinic containing the phrases "cervical collar (2 pcs)" and "Lumbosacral support (LSO)", which provide the Defendants with the ability to select a specific type of support that was more highly priced and profitable.

### 2) The Predetermined Fraudulent Protocol at the Rockaway Ave. Clinic

212. The Rockaway Ave. Clinic was another of the Clinics where the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

213. Similar to the Church Ave. Clinic, subsequent to their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds who purportedly received Fraudulent Equipment from Mednavet, Nalator, Junato, Nayuvito, Tiarillie, Vigull, and Mattana and identified in Exhibits "4" – "10" purportedly received treatment from a variety of healthcare professionals at the Rockaway Ave. Clinic.

214. These Referring Providers included (i) Hong Pak, M.D. ("Pak"); (ii) Denis Clarke, P.A. ("Clarke"); and (iii) Opeolowa Eleyinafe, M.D. ("Eleyinafe").

215. Pak was named as defendant for participating in a No-Fault insurance scheme wherein it was alleged Pak issued prescriptions for DME that were medically unnecessary and part

of a predetermined treatment protocol in <u>GEICO v. Wallegood, Inc., et al.</u>; Index No.: 1:21-cv-01986(PKC)(RLM) (E.D.N.Y 2021).

216.     In keeping with the fact that the prescriptions purportedly issued by the Referring Providers at the Rockaway Ave. Clinic subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination was issued a prescription for virtually the same type of Fraudulent Equipment, regardless of which Referring Provider purportedly issued the prescription.

217.     When the Insureds sought treatment with and were purportedly treated by Referring Providers at the Rockaway Ave. Clinic, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

218.     Instead, regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the Rockaway Ave. Clinic, Referring Providers virtually always prescribed one of two prescriptions for Fraudulent Equipment to virtually every Insured identified in Exhibits "4" – "10".

219.     The first type of prescription for Fraudulent Equipment prescribed to virtually every Insured identified in Exhibits "4" – "10" after a purported initial examination included: (i) "E2611 Lumbar Cushion"; (ii) "L0627 Lumbar Support"; (iii) "L0180 Cervical Collar"; (iv) "E0184 Eggcrate Mattress"; (v) "E0273 Bed Board"; (vi) "E0217 Water Circulation Pump"; and (vii) "Orthopedic Car Seat".

220.     The second type of prescription for Fraudulent Equipment prescribed to virtually every Insured identified in Exhibits "4" – "10" after a purported initial examination included

virtually the same items, only phrased differently and without the HCPCS code identifiers found in the first type of prescription: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; and (viii) a "Deep tissue massager".

221. To the extent that the Insureds identified in Exhibits "4" – "10" returned to the Rockaway Ave. Clinic and purportedly underwent follow-up examinations by a Referring Provider, the Insureds would frequently be provided at least one, and oftentimes three or more additional prescriptions for virtually identical Fraudulent Equipment that were provided to the Defendants or other DME providers, regardless which Referring Provider issued the prescription.

222. Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, Referring Providers virtually always purportedly prescribed the following Fraudulent Equipment to every Insured identified in Exhibits ""4" – "10" that continued treating at the Rockaway Ave. Clinic: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)".

223. Furthermore, and in additional to Fraudulent Equipment described above, Referring Providers at the Rockaway Ave. Clinic purportedly also issued separate additional prescriptions for Fraudulent Equipment that virtually always included at least one of following: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/pump".

224. In further keeping with the fact that the prescriptions for medically unnecessary Fraudulent Equipment purportedly issued to Insureds by the Referring Providers pursuant to a predetermined fraudulent protocol, virtually every Insured who treated at the Rockaway Ave.

Clinic was issued at least one prescription for Fraudulent Equipment that was dated on a day that the Insured was not examined or otherwise treated by the Referring Provider who purportedly issued the prescription, or received at least one prescription that was undated.

225.    For example:

(i)     On November 10, 2020, an Insured named BS was purportedly involved in a motor vehicle accident. BS purportedly started treating at the Rockaway Ave. Clinic with Clarke on January 27, 2021.  Clarke purportedly issued an undated prescription in the name of BS that was provided to **Mednavet** that included the following Fraudulent Equipment: (i) "E2611 Lumbar Cushion"; (ii) "L0627 Lumbar Support"; (iii) "L0180 Cervical Collar"; (iv) "E0184 Eggcrate Mattress"; (v) "E0273 Bed Board"; (vi) "E0217 Water Circulation Pump"; (vii) "Orthopedic Car Seat"; (viii) "Back Massager"; and (ix) "E3660 Elastic Shoulder Splint".  Clarke purportedly also issued two additional undated prescription in the name of BS that were both provided to **Mednavet**.  The first undated prescription was for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)".   The second undated prescription was for a "LSO w APL Control";

(ii)    On November 29, 2020, an Insured named CK was purportedly involved in a motor vehicle accident. CK purportedly started treating at the Rockaway Ave. Clinic with Clarke on December 7, 2020.  After Clarke purportedly performed an initial examination on CK, Clarke purportedly issued a prescription in the name of CK that was provided to **Mednavet** that included the following Fraudulent Equipment: (i) "E2611 Lumbar Cushion"; (ii) "L0627 Lumbar Support"; (iii) "L0180 Cervical Collar"; (iv) "E0184 Eggcrate Mattress"; (v) "E0273 Bed Board"; (vi) "E0217 Water Circulation Pump"; (vii) "Orthopedic Car Seat"; (viii) "Back Massager"; and (ix) "L1820 Knee Orthosis".  Clarke purportedly also issued an undated prescription in the name of CK that was provided to **Mednavet** for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump".  Pak purportedly issued an undated prescription in the name of CK that was provided to **Mednavet** for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)";

(iii)   On December 3, 2020, an Insured named WH was purportedly involved in a motor vehicle accident. WH purportedly started treating at the Rockaway Ave. Clinic with Clarke on December 7, 2020.  After Clarke purportedly performed an initial examination on WH, Clarke purportedly issued an undated prescription in the name of WH that was provided to **Mednavet** that included the following Fraudulent Equipment: (i) "E2611 Lumbar Cushion"; (ii) "L0627 Lumbar Support"; (iii) "L0180 Cervical Collar"; (iv)

"E0184 Eggcrate Mattress"; (v) "E0273 Bed Board"; (vi) "E0217 Water Circulation Pump"; (vii) "Orthopedic Car Seat"; and (viii) "L1820 Knee Orthosis". Clarke purportedly also issued two additional undated prescription in the name of WH that were both provided to **Mednavet**. The first undated prescription was for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; (iii) an "EMS unit (4 leads)"; and (iv) a "Deep tissue massager". The second undated prescription was for a "Cervical traction w/ pump";

(iv)   On December 24, 2020, an Insured named AF was purportedly involved in a motor vehicle accident. AF purportedly started treating at the Rockaway Ave. Clinic with Clarke on January 4, 2021. After Clarke purportedly performed an initial examination on AF, Clarke purportedly issued an undated prescription in the name of AF that was provided to **Nalator** that included the following Fraudulent Equipment: (i) "E2611 Lumbar Cushion"; (ii) "L0627 Lumbar Support"; (iii) "L0180 Cervical Collar"; (iv) "E0184 Eggcrate Mattress"; (v) "E0273 Bed Board"; (vi) "E0217 Water Circulation Pump"; (vii) "Orthopedic Car Seat"; and (viii) "Back Massager". Clarke purportedly also issued an additional undated prescription in the name of AF that was provided to **Nalator** for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; (iii) an "EMS unit (4 leads)"; (iv) a "Cervical traction w/ pump"; and (v) a "LSO w APL Control";

(v)   On December 26, 2020, an Insured named KP was purportedly involved in a motor vehicle accident. KP purportedly started treating at the Rockaway Ave. Clinic with Clarke on January 11, 2021. After Clarke purportedly performed an initial examination on KP, Clarke purportedly issued an undated prescription in the name of KP that was provided to **Nalator** that included the following Fraudulent Equipment: (i) "E2611 Lumbar Cushion"; (ii) "L0627 Lumbar Support"; (iii) "L0180 Cervical Collar"; (iv) "E0184 Eggcrate Mattress"; (v) "E0273 Bed Board"; (vi) "E0217 Water Circulation Pump"; (vii) "Orthopedic Car Seat"; (viii) "Back Massager"; and (ix) "Cane". Clarke purportedly also issued an additional undated prescription in the name of KP that was provided to **Nalator** for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump";

(vi)   On December 27, 2020, an Insured named ACA was purportedly involved in a motor vehicle accident. ACA purportedly started treating at the Rockaway Ave. Clinic with Clarke on January 4, 2021. After Clarke purportedly performed an initial examination on ACA, Clarke purportedly issued an undated prescription in the name of ACA that was provided to **Nalator** that included the following Fraudulent Equipment: (i) "E2611 Lumbar Cushion"; (ii) "L0627 Lumbar Support"; (iii) "E0184 Eggcrate Mattress"; (iv) "E0273 Bed Board"; (v) "E0217 Water Circulation Pump"; (vi) "Orthopedic Car Seat"; (vii) "Back Massager"; and (viii) "L1820 Knee

Orthosis". Clarke purportedly also issued an additional undated prescription in the name of ACA that was provided to **Nalator** for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump". Pak purportedly issued an undated prescription in the name of ACA that was provided to **Nalator** for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)";

(vii) On February 18, 2021, an Insured named KM was purportedly involved in a motor vehicle accident. KM purportedly started treating at the Rockaway Ave. Clinic with Clarke on February 22, 2021. After Clarke purportedly performed an initial examination on KM, Clarke purportedly issued an undated prescription in the name of KM that was provided to **Nalator** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; and (viii) a "Deep tissue massager". On April 13, 2021, Pak purportedly issued a prescription in the name of KM that was provided to a different DME supplier for a "LSO w APL Control", despite Pak not performing any examination or treatment on KM on that date. Pak purportedly also issued an undated prescription in the name of KM that was provided to **Nalator** for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; (iii) an "EMS unit (4 leads)"; and (iv) a "Cervical traction w/ pump";

(viii) On July 30, 2021, an Insured named SC was purportedly involved in a motor vehicle accident. SC purportedly started treating at the Rockaway Ave. Clinic with Pak on August 17, 2021. After Pak purportedly performed an initial examination on SC, Pak purportedly issued an undated prescription in the name of SC that was provided to **Junato** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; and (ix) a "Knee support". On September 8, 2021, Pak purportedly issued a prescription in the name of SC that was provided to a different DME supplier for a "LSO w APL Control", despite Pak not performing any examination or treatment on SC on that date. Pak purportedly also issued two additional undated prescriptions in the name of SC that were both provided to **Junato**. The first prescription was for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)". The second prescription was for a "Cervical traction w/ pump";

(ix) On August 6, 2021, an Insured named CB was purportedly involved in a motor vehicle accident. CB purportedly started treating at the Rockaway Ave. Clinic with Pak on August 10, 2021. After Pak purportedly performed an initial examination on CB, Pak purportedly issued a prescription in the

name of CB that was provided to **Junato** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; and (viii) a "Deep tissue massager". On September 8, 2021, Pak purportedly issued a prescription in the name of CB that was provided to a different DME supplier for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump", despite Pak not performing any examination or treatment on CB on that date. Pak purportedly also issued an additional undated prescription in the name of CB that was provided to **Junato** for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)";

(x)     On October 21, 2021, an Insured named TH was purportedly involved in a motor vehicle accident. TH purportedly started treating at the Rockaway Ave. Clinic with Pak on November 30, 2021. After Pak purportedly performed an initial examination on TH, Pak purportedly issued a prescription in the name of TH that was provided to **Junato** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; and (ix) a "Knee support". On March 10, 2022, after a purported follow-up examination with Pak, Pak purportedly issued a prescription in the name of TH that was provided to **Nayuvito** for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)";

(xi)    On November 18, 2021, an Insured named MH was purportedly involved in a motor vehicle accident. MH purportedly started treating at the Rockaway Ave. Clinic with Pak on November 23, 2021. After Pak purportedly performed an initial examination on MH, Pak purportedly issued a prescription in the name of MH that was provided to **Junato** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; and (ix) a "Shoulder immobilizer". Pak purportedly also issued an additional undated prescription in the name of MH that was provided to **Junato** for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump". On January 18, 2022, Eleyinafe purportedly issued a prescription in the name of MH that was provided to **Junato** for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)"; despite Eleyinafe not performing any examination or treatment on MH on that date;

(xii)　On November 26, 2021, an Insured named SN was purportedly involved in a motor vehicle accident. SN purportedly started treating at the Rockaway Ave. Clinic with Pak on December 7, 2021.　After Pak purportedly performed an initial examination on SN, Pak purportedly issued a prescription in the name of SN that was provided to **Junato** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; and (ix) a "Knee support".　On January 10, 2022, Eleyinafe purportedly issued a prescription in the name of SN that was provided to **Junato** for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump"; despite Eleyinafe not performing any examination or treatment on SN on that date;

(xiii)　On March 8, 2022, an Insured named OC was purportedly involved in a motor vehicle accident. OC purportedly started treating at the Rockaway Ave. Clinic with Pak on March 22, 2022.　After Pak purportedly performed an initial examination on OC, Pak purportedly issued an undated prescription in the name of OC that was provided to **Nayuvito** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; and (ix) a "Shoulder immobilizer".　Pak purportedly also issued two additional undated prescriptions in the name of OC that were both provided to **Nayuvito**.　The first prescription was for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump".　The second undated prescription was for: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)";

(xiv)　On April 3, 2022, an Insured named CW was purportedly involved in a motor vehicle accident. CW purportedly started treating at the Rockaway Ave. Clinic with Pak on April 12, 2022.　After Pak purportedly performed an initial examination on CW, Pak purportedly issued an undated prescription in the name of CW that was provided to **Nayuvito** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; (ix) a "Shoulder immobilizer"; and (x) a "Knee support".　Pak purportedly also issued two additional undated prescriptions in the name of CW that were both provided to **Nayuvito**.　The first prescription was for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump".　The second undated prescription was for: (i) an "Infra

red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)";

(xv)    On May 6, 2022, an Insured named AO was purportedly involved in a motor vehicle accident. AO purportedly started treating at the Rockaway Ave. Clinic with Pak on May 10, 2022.  After Pak purportedly performed an initial examination on AO, Pak purportedly issued a prescription in the name of AO that was provided to **Nayuvito** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; and (ix) a "Shoulder immobilizer".  On June 7, 2022, after a purported follow-up examination with Pak, Pak purportedly issued a prescription in the name of AO that was provided to **Nayuvito** for the following Fraudulent Equipment: (i) an "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)".  On June 14, 2022 Pak purportedly issued a prescription in the name of AO that was provided to **Nayuvito** for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump", despite Pak not performing any examination or any other treatment on AO on that date;

(xvi)   On June 8, 2022, an Insured named JP was purportedly involved in a motor vehicle accident. JP purportedly started treating at the Rockaway Ave. Clinic with Pak on July 19, 2022.  After Pak purportedly performed an initial examination on JP, Pak purportedly issued a prescription in the name of JP that was provided to **Nayuvito** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; and (ix) a "Shoulder immobilizer". Pak purportedly also issued an undated prescription in the name of JP that was provided to **Tiarillie** for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump";

(xvii)  On September 22, 2022, an Insured named HR was purportedly involved in a motor vehicle accident. HR purportedly started treating at the Rockaway Ave. Clinic with Pak on September 27, 2022.  After Pak purportedly performed an initial examination on HR, Pak purportedly issued a prescription in the name of HR that was provided to **Tiarillie** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; (ix) a "Shoulder immobilizer"; and (x) an "Infra red lamp w/ stand".  On November 15, 2022, after a purported follow-up

examination with Pak, Pak purportedly issued a prescription in the name of HR that was provided to **Tiarillie** for the following Fraudulent Equipment: (i) *another* "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)". Pak purportedly issued an undated prescription in the name of HR that was provided to **Tiarillie** for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump";

(xviii) On October 3, 2022, an Insured named FC was purportedly involved in a motor vehicle accident. FC purportedly started treating at the Rockaway Ave. Clinic with Pak on November 1, 2022. After Pak purportedly performed an initial examination on FC, Pak purportedly issued a prescription in the name of FC that was provided to **Tiarillie** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; (ix) a "Shoulder immobilizer"; and (x) an "Infra red lamp w/ stand";

(xix) On November 18, 2022, an Insured named SM was purportedly involved in a motor vehicle accident. SM purportedly started treating at the Rockaway Ave. Clinic with Pak on December 13, 2022. After Pak purportedly performed an initial examination on SM, Pak purportedly issued a prescription in the name of SM that was provided to **Tiarillie** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; (ix) a "Shoulder immobilizer"; (x) a "Knee support"; and (xi) an "Infra red lamp w/ stand". Pak purportedly issued two additional undated prescriptions in the name SM that were both provided to **Vigull**. The first prescription was for: (i) *another* "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)". The second undated prescription was for: (i) a "LSO w APL Control"; and (ii) a "Cervical traction w/ pump"; and

(xx) On March 10, 2023, an Insured named JM was purportedly involved in a motor vehicle accident. JM purportedly started treating at the Rockaway Ave. Clinic with Pak on March 20, 2023. After Pak purportedly performed an initial examination on JM, Pak purportedly issued a prescription in the name of JM that was provided to **Vigull** that included the following Fraudulent Equipment: (i) a "Cervical collar adjustable"; (ii) a "General use cushion (wide)"; (iii) a "Bed pad (Egg crate mattress)"; (iv) a "Bed board"; (v) a "LSO (Lumbosacral back support)"; (vi) an "Orthopedic car seat"; (vii) a "Water circulation unit (w/pump)"; (viii) a "Deep tissue massager"; (ix) a "Shoulder immobilizer"; and (x) a "Knee support". Pak purportedly

issued three additional undated prescriptions in the name JM that were each provided to **Mattana**. The first prescription was for: (i) *another* "Infra red lamp w/ stand"; (ii) a "Whirlpool (hydrotherapy)"; and (iii) an "EMS unit (4 leads)". The second undated prescription was for a "LSO w APL Control". The third undated prescription was for a "Cervical traction w/ pump".

226. These are only representative examples.

227. In fact, virtually all of the Insureds identified in Exhibits "4" – "10" that received treatment at the Rockaway Ave. Clinic were issued virtually identical prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above.

228. In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Rockaway Ave. Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Rockaway Ave. Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

229. Further, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants by Referring Providers at the Rockaway Ave. Clinic were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the Referring Providers who purportedly issued the prescriptions for Fraudulent Equipment virtually never had contemporaneously dated medical records, such as an examination report, that identified the Fraudulent Equipment listed on the prescriptions that the Defendants used to support the charges identified in Exhibits "4" – "10".

230. Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Rockaway Ave. Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous medical records did not contain any

sufficient information to explain why any of the prescribed Fraudulent Equipment was medically necessary or how it would help the Insureds.

231.     Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the Referring Providers' follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

232.     Even more, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, when the Insureds continued to seek treatment at the Rockaway Ave. Clinic, the follow-up examination reports generated by the Referring Providers virtually never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

233.     In further support of the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, many of the prescriptions purportedly issued by Pak and Clarke contained photocopied signatures.

234.     Additionally, the prescriptions purportedly issued by Referring Providers at the Rockaway Ave. Clinic were never given to the Insureds but were routed directly to the Defendants, or other DME/OD supplier, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the

Rockaway Ave. Clinic, without any interaction with or instruction concerning their use from the Defendants, other DME/OD suppliers, or a healthcare provider.

235.     As also part of the fraudulent scheme, the prescriptions purportedly issued by Referring Providers at the Rockaway Ave. Clinic were purposefully generic and vague so as to allow the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

236.     By way of example, rather than specifying the type of back cervical collar and lumbosacral support that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – the Referring Providers at the Rockaway Ave. Clinic, purported to issue prescriptions containing the phrase "LSO (lumbosacral back support)" and "Cervical collar adjustable" with the intent of enabling the Defendants to select a specific type of support that was more highly priced and profitable, instead of issuing prescriptions for support braces that were actually needed in the first instance, to the extent they were actually needed at all.

**F.      The Improper Distribution of Fraudulent Equipment to Insureds by the Defendants Without Valid Prescriptions**

237.     As a threshold matter, for a prescription to be valid it must first actually be issued by a healthcare provider who has determined that such a prescription is medically necessary.

238.     However, many of the prescriptions for Fraudulent Equipment purportedly issued by Referring Providers from the Clinics were not valid prescriptions, as they routinely: (i) contained a photocopied signature of the Referring Provider; (ii) contained a signature stamp of the Referring Provider; (iii) were undated; (iv) were not referenced or explained in any

contemporaneous medical record; and/or (v) were issued on dates the Referring Provider never examined or otherwise treated the Insured.

239.    In addition, the DME Providers are not licensed medical professional corporations, and the Paper Owner Defendants are not licensed to prescribe DME or OD to Insureds. As such, the Defendants were not lawfully permitted to prescribe or otherwise determine what DME or OD is medically necessary for the Insureds. For the same reason, the Defendants cannot properly dispense DME or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies medically necessary DME and/or OD to be provided.

240.    However, as part of the fraudulent scheme, in many of the fraudulent claims identified in Exhibits "1" – "10", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider, to the extent that they actually provided any DME or OD to the Insureds.

241.    More specifically, the prescriptions for DME and/or OD purportedly issued by the Referring Providers and provided to the Defendants did not definitively identify medically necessary DME and/or OD to be provided to the Insureds. For example, the prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

242.    To the extent that some of the fraudulent claims identified in Exhibits "1" - "10" were based upon prescriptions that contained HCPCS Codes next to the descriptions of DME and/or OD, the prescriptions were still vague as the HCPCS Code identified on the prescription did not correspond with the description next to the code, or the Defendants simply ignored the HCPCS Code listed on the prescription and provided an item with a different HCPCS Code.

243.    While the prescriptions purportedly issued by the Referring Providers did not identify a specific type of medically necessary DME and/or OD for the Insureds, the Defendants did not obtain any additional documentation from the Referring Providers approving or otherwise acknowledging that specific types of DME and/or OD – either by HCPCS Code or a detailed description – was medically necessary for the Insureds.

244.    These vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided the Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

245.    In addition, in many of the fraudulent claims identified in Exhibits "1" – "10", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider because the Defendants provided Fraudulent Equipment that was not identified on the prescription.

246.    In a legitimate clinical setting, when a DME/OD Supplier would obtain a prescription that did not contain a HCPCS Code or a sufficient description to identify a specific item of DME and/or OD, the DME/OD Supplier would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements to dispense the appropriate DME and/or OD prescribed to each patient.

247.    As also part of a legitimate clinical setting, the DME/OD Supplier would have the referring healthcare provider sign documentation to confirm that the specific item of DME and/or OD – identified by HCPCS Code or a detailed description – was medically necessary for the patient.

248.    Upon information and belief, the Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Defendants each elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Medicaid Fee Schedule.

249.    For example, and as part of the Defendants' common scheme and operation under the control of the Secret Owner, each of the Defendants improperly decided what DME/OD to provide Insureds – to the extent any items were actually provided – without a valid definitive prescription from a licensed healthcare provider involved, as shown above, for every prescription containing a vague description of a "Lumbosacral support (LSO)" or "LSO (Lumbosacral back support)".

250.    The prescriptions from the Referring Providers containing descriptions Lumbosacral support (LSO)" or "LSO (Lumbosacral back support)", without identifying HCPCS Codes, correspond to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds.

251.    As unlicensed healthcare providers in regard to the prescribing of DME and/or OD items to patients, the Defendants were not legally permitted to determine which of the above-available options were medically necessary for each Insured based upon a vague prescription for a "Lumbosacral support (LSO)" or "LSO (Lumbosacral back support)".

252.    However, the Defendants never contacted the Referring Provider, and instead decided themselves which specific type of Fraudulent Equipment they would bill GEICO for, and

accordingly purportedly provide the Insureds based upon the vague and generic prescriptions for Fraudulent Equipment.

253.     In fact, every time that each of the ten DME Providers received a prescription from the Referring Providers for a "Lumbosacral support (LSO)" or "LSO (Lumbosacral back support)", the each of the Defendants billed GEICO using HCPCS Code L0627 requesting a reimbursement of $322.98, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

254.     Furthermore, each and every time that each of the DME Providers received a prescription from the Referring Providers for a "LSO w/ APL Control" or "LSO APL (Custom Fitted)", the Defendants billed GEICO using HCPCS Code L0632 requesting a reimbursement of $1,150.00, and thereby asserted that they provided the Insureds with that specific item, which resulted in further needlessly inflated charges to GEICO.

255.     Additionally, and as part of the Defendants' common scheme and the control of the Secret Owner, each and every time that each of the ten DME Defendants received a prescription from the Referring Providers for a "Knee support", the Defendants chose to supply and bill GEICO using HCPCS Code L1820 requesting a reimbursement of $110.00, despite the Fee Schedule containing 20 different types of knee orthoses.

256.     Similarly, and as part of the common scheme and control of the Secret Owner, each and every time that each of the ten DME Defendants received a prescription from the Referring Providers for a "Shoulder immobilizer", the Defendants chose to supply and bill GEICO using HCPCS Code L3675 requesting a reimbursement of $141.14, despite the Fee Schedule containing eight different types of shoulder orthoses.

257.    These are only representative examples. To the extent that the Defendants actually provided any Fraudulent Equipment, they improperly prescribed the Fraudulent Equipment for virtually all of the claims identified in Exhibits "1" – "10" that are based upon vague and generic prescriptions because the Defendants decided which specific items of DME and/or OD to provide the Insureds.

258.    The Fraudulent Equipment provided to the Insureds identified in Exhibits "1" – "10" – to the extent that the Fraudulent Equipment was actually provided – by the Defendants was not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) a determination by a licensed healthcare provider that the specific items dispensed to the Insureds were medically necessity. Rather, the Fraudulent Equipment identified in Exhibits "1" – "10" were the result of decisions made by the Defendants.

259.    In all the claims identified in Exhibits "1"- "10" that were based upon vague and generic language contained in the prescriptions, the Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Defendants own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of PIP Benefits.

**G.    The Defendants' Fraudulent Billing for DME and/or OD**

260.    As part of the Defendants' common scheme, the bills submitted to GEICO and other New York automobile insurers by the Defendants were also fraudulent in that they each made virtually identical misrepresentations in the DME and OD purportedly provided to the Insureds.

261. In the bills and other documents submitted to GEICO, the Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between the Defendants and others who are not presently identifiable.

262. In the bills and other documents submitted to GEICO, the Defendants also misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to unlawful financial arrangements between the Defendants and others who are presently unidentifiable.

263. Further, the Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

264. Moreover, and as explained below, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

265. Thereafter, in an attempt to conceal their scheme to fraudulently bill GEICO for DME/OD purportedly provided to GEICO's Insureds, the Defendants would submit multiple bills to GEICO for Fraudulent Equipment to make it appear as though Fraudulent Equipment was

delivered to Insureds over the course of several days, when the Fraudulent Equipment was actually provided to the Insureds on a single day from the Clinic.

266.     The Defendants each split the Fraudulent Equipment purportedly provided to the Insureds across multiple bills to conceal the extent of the fraudulent charges billed to GEICO.

1)     **The Defendants' Fraudulently Misrepresented the Fee Schedule items Purportedly Provided**

267.     When the Defendants' submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

268.     By submitting bills to GEICO containing specific HCPCS Codes, the Defendants each represented that the Fraudulent Equipment purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

269.     With the exception of codes relating to positioning pillows/cushions under HCPCS Code E0190 and electric heating pads under HCPCS Code E0215, in virtually all of the bills submitted to GEICO for Fee Schedule items, the Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

270.     The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Defendants each submitted bills to GEICO containing virtually identical HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

271.     As indicated above, as part of the unlawful financial arrangements between the Defendants and others who are not presently identifiable, the Defendants were provided with

prescriptions purportedly issued by the Referring Providers pursuant to predetermined fraudulent protocols, which provided the Defendants with the opportunity to increase the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

272. Accordingly, the Defendants obtained vague and generic prescriptions for Fraudulent Equipment that permitted them to choose between multiple types of products that would fit the vague description contained on the prescription.

273. Although several options were available to the Defendants based upon the vague and generic prescriptions, the Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

274. However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

275. As identified in the claims contained within Exhibits "1" – "10", each of the Defendants routinely submitted bills to GEICO for Fraudulent Equipment that was purportedly "custom fitted" for each Insured when – to the extent that the Fraudulent Equipment was actually provided to the Insureds – the Defendants never customized the Fraudulent Equipment as billed.

276. For example, each of the Defendants used the vague and generic language in the prescriptions purportedly issued from the Referring Providers to bill GEICO for purportedly providing lumbar orthotics using HCPCS Codes L0627 and L0632. Each of these items require that the orthotic be custom fitted to the patient, and the customization must be done by a certified orthotist.

277.     The products assigned to HCPCS Codes L0627 and L0632 are different types of OD that are required to be customized to fit a specific patient by an individual with expertise.

278.     However, despite billing GEICO – and other New York automobile insurers – using HCPCS Codes L0627 and L0632, the specific orthotic provided by the Defendants – to the extent that the Defendants provided the Insureds with any OD – did not contain the requirements set forth in HCPCS Codes L0627 and L0632 because – at a minimum – the items were never customized to fit each patient.

279.     In keeping with the fact that the claims identified in Exhibits "1" – "10" for custom-fitted OD, including the claims for HCPCS Codes L0627 and L0632 fraudulently misrepresented that the Defendants satisfied all the requirements for the billed HCPCS Codes, the Defendants did not, and could not have, custom-fitted the OD as required.

280.     To the extent that any of the charges identified in Exhibits "1" – "10" for custom-fitted OD, including the claims for HCPCS Codes L0627 and L0632 were provided, none of the Defendants ever customized the equipment as required by Palmetto.

281.     To help clarify the term "custom fitted", Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

282.     One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or

supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

283. By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

284. In the claims identified in Exhibits "1" – "10" for custom-fitted OD, including the claims for HCPCS Codes L0627 and L0632, each of the Defendants fraudulently misrepresented that they provided the Insureds with OD that was custom-fitted as defined by Palmetto, by a certified orthotist.

285. Instead, to the extent that the Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for HCPCS Codes L0627 and L0632, the Fraudulent Equipment was provided without taking any action to custom-fit the OD to the

Insureds. To the extent that the Defendants attempted to make any adjustments to the DME received by Insureds identified in Exhibits "1" -"10", the Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

286.    In keeping with the fact that the Defendants misrepresented that they custom-fitted OD purportedly provided to Insureds and billed to GEICO, the Paper Owner Defendants are not certified orthotists and did not complete sufficient training to become a certified orthotist.

287.    In addition to the fraudulent charges for L0627 and L0632 submitted by all the Defendants, Mednavet, Nalator, Junato, Nayuvito, Tiarillie, Vigull, and Mattana each fraudulently misrepresented that they provided the Insureds identified in Exhibits "4" – "10" with a cervical collar that was custom-fitted and billed to GEICO using HCPCS Code L0180 with a charge of $233.00 when – to the extent that the Defendants provided the Insureds with any cervical collar – it was never customized to fit each Insured as required by HCPCS Code L0180.

288.    Further, Milasig, Levmic, Mednavet, Nalator, Nayuvito, Tairillie, Vigull, and Mattana each fraudulently misrepresented that they provided the Insureds identified in Exhibits "2" – "5" and "7" – "10" with a shoulder orthosis that was custom-fitted and billed to GEICO using HCPCS Code L3674 with a charge of $896.92 when – to the extent that the Defendants provided the Insureds with any shoulder orthosis – it was never customized to fit each Insured as required by HCPCS Code L3674.

289.    Similarly, MMedigna, Milasig, Levmic, Mednavet, Nayuvito, Tiarillie, Vigull, and Mattana each fraudulently misrepresented that they provided the Insureds identified in Exhibits "1" – "4" and "7" – "10" with a knee orthosis that was custom-fitted and billed to GEICO using HCPCS Code L1832 with a charge of $607.55 when – to the extent that the Defendants provided

the Insureds with any knee orthosis – it was never customized to fit each Insured as required by HCPCS Code L1832.

290.     In addition to the Defendants collectively submitting over 1,900 charges for custom-fitted OD, and as part of the fraudulent scheme between the Defendants, each of the Defendants in a virtually identical manner fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits.

291.     The claims identified in Exhibits "1" – "10" for HCPCS Code E0272 is another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

292.     Each of the claims identified within Exhibits "1" – "10" for HCPCS Code E0272 contained a charge for $155.52 based upon prescriptions for an "Egg crate mattress" or "Eggcrate mattress".

293.     However, the product represented by HCPCS Code E0272 is defined as a foam rubber mattress, which is an actual full-size mattress, not a mattress topper or pad in the shape of an egg crate.

294.     Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0272, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not foam rubber mattresses as required by HCPCS Code E0272.

295.     By contrast, to the extent that any items were provided, they were mattress pads or toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items

listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

296.    Unlike the fraudulent charges for $155.52 for each eggcrate mattress billed under HCPCS Code E0272 – and in keeping with the fact that the fraudulent charges were part of the Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code L0199.

297.    In each of the claims identified within Exhibits "1"- "10" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

298.    The claims identified in Exhibits "1" – "10" for HCPCS Code E02611 is another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

299.    Each of the claims identified within Exhibits "1" – "10" for HCPCS Code E2611 contained a charge for $282.40 based upon prescriptions for an "Orthopedic pillow" or "Lumbar cushion".

300.    However, the product represented by HCPCS Code E02611 is defined as a general use wheelchair back cushion with a width of less than 22 inches.

301.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2611, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not back cushions for use with a wheelchair.

302.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" - "10", who were purportedly provided with a wheelchair back cushion by the Defendants that was billed to GEICO under HCPCS Code E2611 were in a wheelchair.

303.    By contrast, to the extent that any items were provided, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

304.    Unlike the fraudulent charges for $282.40 for each orthopedic pillow or lumbar cushion billed under HCPCS Code E02611 – and in keeping with the fact that the fraudulent charges were part of the Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

305.    In each of the claims identified within Exhibits "1"- "10" where the Defendants billed for Fraudulent Equipment under HCPCS Code E2611, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E2611.

306.    The claims identified in Exhibits "1" – "10" for HCPCS Code E0274 is another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

307.    Each of the claims identified within Exhibits "1" – "10" for HCPCS Code E0274 contained a charge for $101.85 based upon prescriptions for an "bed board".

308. However, the product represented by HCPCS Code E0274 is defined as an over-bed table and is a table akin to those found in hospitals that permit a bed-bound individual the use of a table while confined to a bed.

309. Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0274, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not over-bed tables as required by HCPCS Code E0274.

310. By contrast, to the extent that any items were provided, they were bed boards, or large, flat pieces of cardboard that are placed under a mattress to make the mattress firmer and can keep the mattress from sinking. A bed board is listed under HCPCS Code E0273, which is a Non-Fee Schedule Item.

311. As a Non-Fee Schedule Item, the reimbursement for HCPCS Code E0273 is the lesser of either 150% of the acquisition cost to the Defendants or the cost to the general public.

312. GEICO was able to determine the exact bed boards supplied by the Defendants, which are available for purchase to the general public on websites like Walmart.com for $22.99.

313. Unlike the fraudulent charges for $101.85 for each bed board billed under HCPCS Code E0274 – and in keeping with the fact that the fraudulent charges were part of the Defendants' common scheme to defraud GEICO and other automobile insurers – as a Non-Fee Schedule Item the Defendants could charge no more than $22.99 under HCPCS Code E0273.

314. In each of the claims identified within Exhibits "1"- "10" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0274, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0274.

315. The claims identified in Exhibits "1" – "10" for HCPCS Code T5001 is another is another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

316. Each of the claims identified within Exhibits "1" – "10" for HCPCS Code T5001 contained a charge of between $237.50 - $329.85 based upon prescriptions for an "orthopedic car seat".

317. However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons with special orthopedic needs, which is for persons who are unable to rely on their vehicles built-in restraint systems due to their special orthopedic needs, such as cerebral palsy.

318. Despite billing GEICO – and other New York automobile insurers – using HCPCS Code T5001, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not positioning seats for persons with special orthopedic needs, as required by HCPCS Code T5001.

319. By contrast, to the extent that any items were provided, they were seat pads or cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories.

320. Unlike the fraudulent charges for between $237.50 - $329.85 for each "orthopedic car seat" billed under HCPCS Code T5001 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers –

the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

321.    In each of the claims identified within Exhibits "1" – "10" where the Defendants billed for Fraudulent Equipment under HCPCS Code T5001, each of the bills fraudulently mispresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code T5001.

322.    The claims identified in Exhibits "1" – "10" for HCPCS Code E0480 is another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

323.    Each of the claims identified within Exhibits "1" – "10" for HCPCS Code E0480 contained a charge of $355.56 based upon prescriptions for an "massager".

324.    However, the product represented by HCPCS Code E0480 is defined as airway clearance device percussor, which is used to help prevent aspiration in a patient by clearing excessive mucus and are typically prescribed to patients diagnosed with cystic fibrosis, chronic bronchitis, muscular dystrophy or have other conditions which inhibit a patient's ability to expectorate.

325.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0480, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not airway clearance devices as required by HCPCS Code E0480.

326.     By contrast, to the extent that any items were provided, they were personal massagers.   Personal massagers are Non-Fee Schedule items, which should have been billed under HCPCS Code E1399.

327.     As a Non-Fee Schedule Item, the reimbursement for HCPCS Code E1399 is the lesser of either 150% of the acquisition cost to the Defendants or the cost to the general public.

328.     GEICO was able to determine the exact massager supplied by the Defendants, which are available for purchase to the general public on websites like Amazon.com for $38.99.

329.     Unlike the fraudulent charges for between $355.56 for each "massager" billed under HCPCS Code E0480 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – as a Non-Fee Schedule Item the Defendants could charge no more than $38.99 under HCPCS Code E1399.

330.     In each of the claims identified within Exhibits "1"- "10" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0480, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0480.

331.     With the exception of the claims identified using HCPCS Codes E0190 and E0215, in each of the claims for Fee Schedule items identified within Exhibits "1" – "10", to the extent that any Fraudulent Equipment was actually provided, the Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and were therefore not eligible to collect No-Fault Benefits in the first instance.

2)  **The Defendants' Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items**

332.     When the Defendants submitted bills to GEICO for Non-Fee Schedule items, the Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

333.     As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

334.     By submitting bills to GEICO for Non-Fee Schedule items, the Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

335.     However, in virtually all of the charges to GEICO identified in Exhibits "1" – "10" for Non-Fee Schedule items, each of the Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

336.     Instead, the Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

337.     The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

338.     When the Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the Defendants' acquisition cost

of purportedly high-quality items. In actuality, the Defendants' legitimate acquisition cost for the low-quality items were significantly less.

339.     In keeping with the fact that the Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

340.     The Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

341.     As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" - "10" virtually always misrepresented the permissible reimbursement amount.

342.     For example, the Defendants collectively billed GEICO for over 800 infrared heat lamps under HCPCS Code E0205 with a charge of between $233.50 - $325.76 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

343.     To the extent that any items were provided, the infrared lamps were low quality items and the permissible reimbursement rate was significantly less than the $233.50 - $325.76 charged by the Defendants.

344.     In fact, GEICO was able to determine one of the exact infrared heat lamps supplied by the Defendants, which are available for purchase to the general public on eBay.com for $19.99.

345.    In all of the charges submitted to GEICO for infrared heat lamps under HCPCS Code E0205, the Defendants fraudulently sought reimbursement for between $233.50 - $325.76 per unit when the maximum reimbursement charge was no more than $19.99.

346.    Similarly, the Defendants billed GEICO for a water circulating heat pad with pump under HCPCS Codes E0217 and E0218 with a charge of between $273.32 - $480.34 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

347.    To the extent that any items were provided, the water circulating heat pad with pumps were low quality items and the permissible reimbursement rate was significantly less than the $273.32 - $480.34 charged by the Defendants.

348.    In fact, GEICO was able to determine one of the exact water circulating heat pad with pumps supplied by the Defendants, which are available for purchase to the general public on eBay.com for $49.99.

349.    In virtually all of the charges submitted to GEICO for a water circulating heat pad with pump, the Defendants fraudulently sought reimbursement for between $273.32 - $480.34 per unit when the maximum reimbursement charge was no more than $49.99.

350.    The Defendants also collectively billed GEICO for over 800 EMS units under HCPCS Code E0745 with a charge of between $218.40 - $399.85 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

351.    To the extent that any items were provided, the EMS units were low quality items and the permissible reimbursement rate was significantly less than the $350.00 charged by the Defendants.

352.    In fact, GEICO was able to determine one of the exact EMS units supplied by the Defendants, which are available for purchase to the general public on AliExpress.com for $4.99.

353.     In virtually all of the charges submitted to GEICO for EMS units, the Defendants fraudulently sought reimbursement for $218.40 - $399.85 per unit when the maximum reimbursement charge was no more than $4.99.

354.     These are only representative examples. In each of the claims identified within Exhibits "1" - "10" for Non-Fee Schedule items, each of the Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges were not in the Medicaid Fee Schedule and were the lesser of 150% of the acquisition cost or the cost to the general public. Therefore, the Defendants were not eligible to collect No-Fault Benefits in the first instance.

## III.     The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

355.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of the DME Providers, seeking payment for Fraudulent Equipment.

356.     The NF-3 forms, HCFA-1500 forms and treatment reports that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

> (i)     The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, they were not properly licensed by the DCWP as they falsified the information contained in their applications for a Dealer for Products License.

> (ii)     The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for

reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

357.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

358.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

359.    Specifically, they knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the DME Providers to obtain a Dealer in Products License from the DCWP because the Paper Owner Defendants falsely indicated, under penalty for false statements, in the application for a Dealer in Products License the common ownership by the Secret Owner of each of the DME Providers, and concealed these misrepresentations in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

360. The Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – the result of unlawful financial arrangements, were provided to the Defendants, and ultimately used as the basis to submit bills to GEICO to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

361. Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were – not based upon medical necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

362. Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

363. Even more, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

364. Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification,

including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.

365.     The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

366.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1.1 million based upon the fraudulent charges representing payments made by GEICO to the Defendants.

367.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Medigna, Mednavet, Nayuvito, Mattana, Milasig, Levmic, Junato, Vigull, Nalator, and Tiarillie**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

368.     GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

369.     There is an actual case in controversy between GEICO and each of the DME Providers regarding more than $1.7 million in fraudulent billing that has been submitted to GEICO in the names of DME Providers.

370.     The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the Defendants did not comply with all local licensing laws as Nalator never obtained Dealer in Products license and the remaining DME Providers falsified business owners on the applications for Dealer in Products Licenses, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

371.     The DME Providers also have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

372.     The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others who are not presently known, rather than to treat the Insureds.

373.     The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the DME Providers purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions for medically necessary items issued by healthcare providers who are licensed to issue such prescriptions.

374.     The DME Providers have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Providers actually provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

375. The DME Providers have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Providers provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

376. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Medigna, Mednavet, Nayuvito, Mattana, Milasig, Levmic, Junato, Vigull, Nalator, and Tiarillie.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and the John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

377. GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

378. Medigna, Mednavet, Nayuvito, Mattana, Milasig, Levmic, Junato, Vigull, Nalator, and Tiarillie together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

379. The members of the DME Provider Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Medigna, Mednavet, Nayuvito, Mattana, Milasig, Levmic, Junato, Vigull, Nalator, and Tiarillie are ostensibly independent businesses – with different names and tax

identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

380.  The DME Provider Enterprise operated under ten separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

381.  The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

382.  The Paper Owner Defendants and John Doe Defendant "1" have each been employed by and/or associated with the DME Provider Enterprise.

383.  Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud

statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because:: (i) in every claim, that the DME Providers had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License or never obtained a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO

that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" – "10".

384.    The DME Providers Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Providers, inasmuch as the DME Providers never operated as a legitimate DME/OD provider, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Providers to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the DME Providers to the present day.

385.    The DME Providers Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Providers Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1.1 million pursuant to the fraudulent bills submitted by the Defendants through the DME Providers Enterprise.

386.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## **THIRD CAUSE OF ACTION**
### **Against the Paper Owner Defendants and the John Doe Defendants**
### **(Violation of RICO, 18 U.S.C. § 1962(d))**

387.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

388.    The DME Providers Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

389.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Providers Enterprise.

390.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Providers Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: (i) in every claim, that the DME Providers had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License or never obtained a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to

the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" – "10".

391.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

392.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1.1 million pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

393.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against L. Medvid and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

394. GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

395. Medigna is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

396. L. Medvid and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Medigna's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Medigna was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Medigna had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Medigna was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS

Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

397.    Medigna's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which L. Medvid and John Doe Defendant "1" operate Medigna, insofar as Medigna is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Medigna to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the L. Medvid and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Medigna to the present day.

398.    Medigna is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Medigna in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

399.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $560,000.00 pursuant to the fraudulent bills submitted through Medigna.

400.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Medigna, L. Medvid, and John Doe Defendant "1"**
**(Common Law Fraud")**

401.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

402.    Medigna, L. Medvid, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

403.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Medigna had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Medigna was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation

that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

404.     Medigna, L. Medvid, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Medigna that were not compensable under New York no-fault insurance laws.

405.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $560,000.00 pursuant to the fraudulent bills submitted by Medigna, L. Medvid, and John Doe Defendant "1".

406.     Medigna, L. Medvid, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

407.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against Medigna, L. Medvid, and John Doe Defendant "1"**
**(Unjust Enrichment)**

408.     GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

409.     As set forth above, Medigna, L. Medvid, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

410.     When GEICO paid the bills and charges submitted by or on behalf of Medigna for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

411.     Medigna, L. Medvid, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Medigna, L. Medvid, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

412.     Medigna, L. Medvid, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

413.     By reason of the above, Medigna, L. Medvid, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $560,000.00.

## SEVENTH CAUSE OF ACTION
### Against L. Sigal and John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

414.     GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

415.     Milasig is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

416.     L. Sigal and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Milasig's affairs through a pattern of racketeering activity

consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Milasig was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Milasig had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Milasig was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO

that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

417.     Milasig's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which L. Sigal and John Doe Defendant "1" operate Milasig, insofar as Milasig is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Milasig to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the L. Sigal and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Milasig to the present day.

418.     Milasig is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Milasig in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

419.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $80,000.00 pursuant to the fraudulent bills submitted through Milasig.

420.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Milasig, L. Sigal, and John Doe Defendant "1"**
**(Common Law Fraud")**

421.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

422. Milasig, L. Sigal, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

423. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Milasig had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Milasig was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

424. Milasig, L. Sigal, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Milasig that were not compensable under New York no-fault insurance laws.

425. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $80,000.00 pursuant to the fraudulent bills submitted by Milasig, L. Sigal, and John Doe Defendant "1".

426. Milasig, L. Sigal, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

427. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Milasig, L. Sigal, and John Doe Defendant "1"**
**(Unjust Enrichment)**

428. GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

429. As set forth above, Milasig, L. Sigal, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

430. When GEICO paid the bills and charges submitted by or on behalf of Milasig for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

431.    Milasig, L. Sigal, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Milasig, L. Sigal, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

432.    Milasig, L. Sigal, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

433.    By reason of the above, Milasig, L. Sigal, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $80,000.00.

**TENTH CAUSE OF ACTION**
**Against L. Sigal and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

434.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

435.    Levmic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

436.    L. Sigal and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Levmic's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Levmic was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Levmic had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Levmic was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable

and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

437. Levmic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which L. Sigal and John Doe Defendant "1" operate Levmic, insofar as Levmic is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Levmic to function. Furthermore, the intricate planning required to carry out and conceal the

predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the L. Sigal and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Levmic to the present day.

438.    Levmic is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Levmic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

439.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $51,000.00 pursuant to the fraudulent bills submitted through Levmic.

440.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against Levmic, L. Sigal, and John Doe Defendant "1"**
**(Common Law Fraud")**

441.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

442.    Levmic, L. Sigal, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

443.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Levmic had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Levmic was not lawfully licensed as they knowingly

falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

444.     Levmic, L. Sigal, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Levmic that were not compensable under New York no-fault insurance laws.

445.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $51,000.00 pursuant to the fraudulent bills submitted by Levmic, L. Sigal, and John Doe Defendant "1".

446.    Levmic, L. Sigal, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

447.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Levmic, L. Sigal, and John Doe Defendant "1"**
**(Unjust Enrichment)**

448.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

449.    As set forth above, Levmic, L. Sigal, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

450.    When GEICO paid the bills and charges submitted by or on behalf of Levmic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

451.    Levmic, L. Sigal, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Levmic, L. Sigal, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

452.    Levmic, L. Sigal, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

453.    By reason of the above, Levmic, L. Sigal, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $51,000.00.

## THIRTEENTH CAUSE OF ACTION
### Against L. Medvid and John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

454.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

455.    Mednavet is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

456.    L. Medvid and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Mednavet's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Mednavet was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Mednavet had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Mednavet was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the

Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

457.    Mednavet's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which L. Medvid and John Doe Defendant "1" operate Mednavet, insofar as Mednavet is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Mednavet to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the L. Medvid and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Mednavet to the present day.

458.    Mednavet is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful

acts are taken by Mednavet in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

459.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $54,000.00 pursuant to the fraudulent bills submitted through Mednavet.

460.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTEENTH CAUSE OF ACTION**
**Against Mednavet, L. Medvid, and John Doe Defendant "1"**
**(Common Law Fraud")**

461.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

462.     Mednavet, L. Medvid, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

463.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Mednavet had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Mednavet was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment

were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

464.    Mednavet, L. Medvid, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Mednavet that were not compensable under New York no-fault insurance laws.

465.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $54,000.00 pursuant to the fraudulent bills submitted by Mednavet, L. Medvid, and John Doe Defendant "1".

466.    Mednavet, L. Medvid, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

467. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Mednavet, L. Medvid, and John Doe Defendant "1"
### (Unjust Enrichment)

468. GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

469. As set forth above, Mednavet, L. Medvid, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

470. When GEICO paid the bills and charges submitted by or on behalf of Mednavet for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

471. Mednavet, L. Medvid, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Mednavet, L. Medvid, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

472. Mednavet, L. Medvid, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

473. By reason of the above, Mednavet, L. Medvid, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $54,000.00.

## SIXTEENTH CAUSE OF ACTION
### Against A. Berchansky and John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

474. GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

475. Nalator is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

476. A. Berchansky and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Nalator's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Nalator was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Nalator was entitled to No-Fault Benefits and were in compliance with all licensing requirements when in fact Nalator was not in compliance with all licensing requirements as they failed to apply for or receive a Dealer in Products license from the City of New York; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment

accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

477.     Nalator's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which A. Berchansky and John Doe Defendant "1" operate Nalator, insofar as Nalator is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Nalator to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the A. Berchansky and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Nalator to the present day.

478.     Nalator is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Nalator in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

479.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $38,000.00 pursuant to the fraudulent bills submitted through Nalator.

480.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**SEVENTEENTH CAUSE OF ACTION**
**Against Nalator, A. Berchansky, and John Doe Defendant "1"**
**(Common Law Fraud")**

481.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

482.     Nalator, A. Berchansky, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

483.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Nalator was eligible to collect No-Fault Benefits and complied with all licensing requirements when in fact Nalator was not lawfully licensed as they failed to apply for or receive a Dealer in Products license from the City of New York; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent

Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

484. Nalator, A. Berchansky, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Nalator that were not compensable under New York no-fault insurance laws.

485. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $38,000.00 pursuant to the fraudulent bills submitted by Nalator, A. Berchansky, and John Doe Defendant "1".

486. Nalator, A. Berchansky, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

487. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Nalator, A. Berchansky, and John Doe Defendant "1"
### (Unjust Enrichment)

488.     GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

489.     As set forth above, Nalator, A. Berchansky, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

490.     When GEICO paid the bills and charges submitted by or on behalf of Nalator for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

491.     Nalator, A. Berchansky, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Nalator, A. Berchansky, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

492.     Nalator, A. Berchansky, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

493.     By reason of the above, Nalator, A. Berchansky, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $38,000.00.

### NINETEENTH CAUSE OF ACTION
**Against V. Sherapova and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

494.     GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

495.     Junato is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

496.     V. Sherapova and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Junato's affairs through a pattern of racketeering

activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Junato was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Junato had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Junato was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO

that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

497.     Junato's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which V. Sherapova and John Doe Defendant "1" operate Junato, insofar as Junato is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Junato to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the V. Sherapova and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Junato to the present day.

498.     Junato is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Junato in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

499.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $156,000.00 pursuant to the fraudulent bills submitted through Junato.

500.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTIETH CAUSE OF ACTION**
**Against Junato, V. Sherapova, and John Doe Defendant "1"**
**(Common Law Fraud")**

501.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

502. Junato, V. Sherapova, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

503. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Junato had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Junato was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

504.    Junato, V. Sherapova, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Junato that were not compensable under New York no-fault insurance laws.

505.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $156,000.00 pursuant to the fraudulent bills submitted by Junato, V. Sherapova, and John Doe Defendant "1".

506.    Junato, V. Sherapova, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

507.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
### Against Junato, V. Sherapova, and John Doe Defendant "1"
### (Unjust Enrichment)

508.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

509.    As set forth above, Junato, V. Sherapova, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

510.    When GEICO paid the bills and charges submitted by or on behalf of Junato for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

511.    Junato, V. Sherapova, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Junato, V. Sherapova, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

512.    Junato, V. Sherapova, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

513.    By reason of the above, Junato, V. Sherapova, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $156,000.00.

<u>**TWENTY-SECOND CAUSE OF ACTION**</u>
**Against L. Medvid and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

514.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

515.    Nayuvito is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

516.    L. Medvid and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Nayuvito's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Nayuvito was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, that Nayuvito had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Nayuvito was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) in every claim, that the prescriptions for Fraudulent Equipment were

for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "7".

517.     Nayuvito's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which L. Medvid and John Doe Defendant "1" operate Nayuvito, insofar as Nayuvito is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Nayuvito to function. Furthermore, the intricate planning required to carry out and conceal the

predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the L. Medvid and John Doe Defendant "1" continue to attempt collection on the fraudulent billing submitted by Nayuvito to the present day.

518.     Nayuvito is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Nayuvito in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

519.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $84,000.00 pursuant to the fraudulent bills submitted through Nayuvito.

520.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Nayuvito, L. Medvid, and John Doe Defendant "1"**
**(Common Law Fraud")**

521.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

522.     Nayuvito, L. Medvid, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

523.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Nayuvito had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Nayuvito was not lawfully licensed as they

knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

524.    Nayuvito, L. Medvid, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Nayuvito that were not compensable under New York no-fault insurance laws.

525.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $84,000.00 pursuant to the fraudulent bills submitted by Nayuvito, L. Medvid, and John Doe Defendant "1".

526.     Nayuvito, L. Medvid, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

527.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<strong><u>TWENTY-FOURTH CAUSE OF ACTION</u></strong><br><strong>Against Nayuvito, L. Medvid, and John Doe Defendant "1"</strong><br><strong>(Unjust Enrichment)</strong>

528.     GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

529.     As set forth above, Nayuvito, L. Medvid, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

530.     When GEICO paid the bills and charges submitted by or on behalf of Nayuvito for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

531.     Nayuvito, L. Medvid, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Nayuvito, L. Medvid, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

532.     Nayuvito, L. Medvid, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

533. By reason of the above, Nayuvito, L. Medvid, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $84,000.00.

any other relief the Court deems just and proper.

**TWENTY-FIFTH CAUSE OF ACTION**
**Against Tiarillie, A. Berchansky, and John Doe Defendant "1"**
**(Common Law Fraud")**

534. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

535. Tiarillie, A. Berchansky, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

536. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Tiarillie had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Tiarillie was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who

are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "8".

537.     Tiarillie, A. Berchansky, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tiarillie that were not compensable under New York no-fault insurance laws.

538.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $57,000.00 pursuant to the fraudulent bills submitted by Tiarillie, A. Berchansky, and John Doe Defendant "1".

539.     Tiarillie, A. Berchansky, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

540. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SIXTH CAUSE OF ACTION
### Against Tiarillie, A. Berchansky, and John Doe Defendant "1"
### (Unjust Enrichment)

541. GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

542. As set forth above, Tiarillie, A. Berchansky, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

543. When GEICO paid the bills and charges submitted by or on behalf of Tiarillie for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

544. Tiarillie, A. Berchansky, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Tiarillie, A. Berchansky, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

545. Tiarillie, A. Berchansky, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

546. By reason of the above, Tiarillie, A. Berchansky, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $57,000.00.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Vigull, V. Sherapova, and John Doe Defendant "1"
### (Common Law Fraud")

547. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

548. Vigull, V. Sherapova, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

549. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Vigull had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Vigull was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal

to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "9".

550. Vigull, V. Sherapova, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Vigull that were not compensable under New York no-fault insurance laws.

551. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $21,000.00 pursuant to the fraudulent bills submitted by Vigull, V. Sherapova, and John Doe Defendant "1".

552. Vigull, V. Sherapova, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

553. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against Vigull, V. Sherapova, and John Doe Defendant "1"
### (Unjust Enrichment)

554. GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

555.    As set forth above, Vigull, V. Sherapova, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

556.    When GEICO paid the bills and charges submitted by or on behalf of Vigull for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

557.    Vigull, V. Sherapova, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Vigull, V. Sherapova, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

558.    Vigull, V. Sherapova, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

559.    By reason of the above, Vigull, V. Sherapova, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $21,000.00.

## TWENTY-NINTH CAUSE OF ACTION
### Against Mattana, L. Medvid, and John Doe Defendant "1"
### (Common Law Fraud")

560.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

561.    Mattana, L. Medvid, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

562.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Mattana had a lawful Dealer in Products License

and was entitled to No-Fault Benefits when in fact Mattana was not lawfully licensed as they knowingly falsified the business address and owner information on their application for a Dealer in Products; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "10".

563. Mattana, L. Medvid, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce

GEICO to pay charges submitted through Mattana that were not compensable under New York no-fault insurance laws.

564.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $47,000.00 pursuant to the fraudulent bills submitted by Mattana, L. Medvid, and John Doe Defendant "1".

565.    Mattana, L. Medvid, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

566.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTIETH CAUSE OF ACTION
### Against Mattana, L. Medvid, and John Doe Defendant "1"
### (Unjust Enrichment)

567.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

568.    As set forth above, Mattana, L. Medvid, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

569.    When GEICO paid the bills and charges submitted by or on behalf of Mattana for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

570.    Mattana, L. Medvid, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Mattana, L. Medvid, and John Doe

Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

571.    Mattana, L. Medvid, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

572.    By reason of the above, Mattana, L. Medvid, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $47,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Medigna, Milasig, Levmic, Mednavet, Nalator, Junato, Nayuvito, Tiarillie, Vigull, and Mattana for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Medigna, Milasig, Levmic, Mednavet, Nalator, Junato, Nayuvito, Tiarillie, Vigull, and Mattana have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1.1 million together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1.1 million together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.　　On the Fourth Cause of Action against L. Medvid and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $560,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.　　On the Fifth Cause of Action against Medigna, L. Medvid and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $560,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.　　On the Sixth Cause of Action against Medigna, L. Medvid and John Doe Defendant "1" for more than $560,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.　　On the Seventh Cause of Action against L. Sigal and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $80,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.　　On the Eighth Cause of Action against Milasig, L. Sigal, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $80,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.　　On the Ninth Cause of Action against Milasig, L. Sigal, and John Doe Defendant "1" for more than $80,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against L. Sigal and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $51,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Levmic, L. Sigal, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $51,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Levmic, L. Sigal, and John Doe Defendant "1" for more than $51,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against L. Medvid, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $54,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Mednavet, L. Medvid, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $54,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Mednavet, L. Medvid, and John Doe Defendant "1" for more than $54,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P.	On the Sixteenth Cause of Action against A. Berchansky and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $38,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.	On the Seventeenth Cause of Action against Nalator, A. Berchansky, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $38,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

R.	On the Eighteenth Cause of Action against Nalator, A. Berchansky, and John Doe Defendant "1" for more than $38,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

S.	On the Nineteenth Cause of Action against V. Sherapova and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $156,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.	On the Twentieth Cause of Action against Junato, V. Sherapova and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $156,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.	On the Twenty-First Cause of Action against Junato, V. Sherapova and John Doe Defendant "1" for more than $156,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

V.     On the Twenty-Second Cause of Action against L. Medvid and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $84,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.     On the Twenty-Third Cause of Action against Nayuvito, L. Medvid, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $84,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

X.     On the Twenty-Fourth Cause of Action against Nayuvito, L. Medvid, and John Doe Defendant "1" for more than $84,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Y.     On the Twenty-Fifth Cause of Action against Tiarillie, A. Berchansky, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $57,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Z.     On the Twenty-Sixth Cause of Action against Tiarillie, A. Berchansky, and John Doe Defendant "1" for more than $57,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

AA.     On the Twenty-Seventh Cause of Action against Vigull, V. Sherapova, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $21,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

BB.    On the Twenty-Eighth Cause of Action against Vigull, V. Sherapova, and John Doe Defendant "1" for more than $21,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

CC.    On the Twenty-Ninth Cause of Action against Mattana, L. Medvid and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $47,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

DD.   On the Thirtieth Cause of Action against Mattana, L. Medvid and John Doe Defendant "1" for more than $47,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: December 27, 2023
       Uniondale, New York

RIVKIN RADLER LLP

By:____/s/ Barry I. Levy_____
       Barry I. Levy
       Michael A. Sirignano
       Michael Vanunu
       Philip P. Nash
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*